IN THE UNITED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Kenneth Wright, professionally
known as "Romance",

        Plaintiff,                         Case No. 1:21-cv-05085

v.                                       __JURY TRIAL DEMANDED__

DJ International Records, ASCAP, Pop Star Publishing,
London Records/FFRR, Bolloré SE, Vivendi
SE, The Seagram Company Ltd., Warner Bros.,
Harmless Records, Polydor Japan,Virgin EMI,
Demon Music, Peermusic, SoundExchange,
Spotify, BMI and Universal Music Group, and
JOHN DOES 1-10,

        Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff Kenneth Wright ("Plaintiff"), by and through Pro Se, in complaining of the Defendant
Soundexchange ("Defendant"), states as follows:

## JURISDICTION AND VENUE

1. This is an action for copyright infringement arising under the Copyright Act of 1976, as
   amended, Title 17, United States Code, §§ 101 et seq. (the "Copyright Act"), and pendant
   claims pursuant to the laws of the State of Illinois.

2. Court has original subject-matter jurisdiction over the Copyright Act claims pursuant to 28
   U.S.C. § 1331. To the extent this Complaint contains claims for relief under Illinois law,
   those claims are specifically authorized to be brought in this Court under the provisions of
   28 U.S.C. §§ 1338(a) and 1338(b).

3.  This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332. The citizenship of Plaintiff is fully diverse from that of Defendants, and the amount in controversy exceeds $75,000, exclusive of interest.

4.  This Court has personal jurisdiction over Defendants because they are domiciled in the State of Illinois and incorporated under the laws of the State of Illinois.

5.  This Court has further personal jurisdiction over Defendants because they, and each of them, conduct business continuously and systematically in Illinois for the purpose of engaging in, inter alia, the manufacture and distribution of sound recordings and the licensing of musical compositions created and/or owned by Mr. Wright, as well as related activities within the State of Illinois.

6.  Defendants are further subject to personal jurisdiction based on their acts of placing their products into the stream of commerce with the expectation that such products will be delivered to and viewed by consumers within the State of Illinois and within this District.

7.  Venue is proper in this Judicial District because a substantial part of the events or omissions giving rise to the claim occurred Venue is also proper in this Judicial District pursuant to 28 U.S.C. § 1400(a).

## PARTIES

8.  Plaintiff, Kenneth Wright, professionally known as "Romance" ("Wright"), is a resident of the State of California.

9.  Defendant DJ International ("DJ International"), is a corporation created under the laws of the State of Illinois, having a principal place of business in the city of Chicago.

10. Defendant Pop Star Publishing ("Pop Star"), is a corporation created under the laws of the State of Illinois, having a principal place of business in the city of Chicago.

11. Defendant London Records/FFRR, is a corporation created under the laws of the United Kingdom, having a principal place of business in the city of London.

12. Defendant Bolloré SE is a corporation created under the laws of the Territory of Europe, a principal place of business in the country of France.

13. Defendant Vivendi SE is a corporation created under the laws of the Territory of Europe, a principal place of business in the country of France.

14. Defendant The Seagram Company Ltd. is a corporation created under the laws of the Territory of Canada, a principal metropolis of the province of Quebec, place of business in the city of Montreal.

15. Defendant Warner Bros., is a corporation created under the laws of the State of Illinois, having a principal place of business in the city of Chicago.

16. Defendant Virgin EMI is a corporation created under the laws of the Territory of United Kingdom, having a principal place of business in the city of London.

17. Defendant SoundExchange is a corporation created under the laws of the State of District Columbia, having a principal place of business in the city of Washington.

18. Defendant BMI is a corporation created under the laws of the State of Nashville, having a principal place of business in the city of Tennessee.

19. Defendant Universal Music Group is a corporation created under the laws of the State of California, having a principal place of business in the city of Santa Monica.

20. Defendant Harmless Records is a corporation created under the laws of the Territory of the United Kingdom, having a principal place of business in the city of Warford.

21. Defendant Demon Music is a corporation created under the laws of the Territory of the United Kingdom, having a principal place of business in the city of London.

22. Defendant Peermusic is a corporation created under the laws of the Territory of the United Kingdom, having a principal place of business in the city of London.

23. Defendant Polydor Ltd. Is a corporation created under the laws of the Territory of the United Kingdom, having a principal place of business in the city of London and under the laws of the Territory of East Asia, having a principal place of business in the city of Japan .

## **FACTUAL ALLEGATIONS**

24. Plaintiff is informed and believe, and based thereon allege, that Defendant DJ International ("DJ International") is an entity of unknown legal origins, having a principal place of business in the City of Chicago, and at all relevant times was owned and operated by 'Alexander Alcarese' and 'Lauren Alcarese' both of whom are presumed living at the time of this complaint.

25. Mr. Kenneth Anthony Wright (whose pseudonym is ROMANCE) wrote, composed, arranged, produced, and performed, the distinctive 'sound recording' song titled "All Dis

Music". He is also the only holder of an October 14th, 1986, © Copyright on this song. The defunct Chicago record company 'DJ International'™ (now listed as a subsidiary of UniversalMusic Group) before its longtime owners 'Alexander Alcarese' aka 'Rocky Jones' and Accountant Lauren Alcarese ceased doing business in 2019, illegally conveyed authority over the sale, manufacture, and distribution of a 'test pressing' for 'All Dis Music' without sharing any knowledge of this to Mr. Kenneth Anthony Wright.

26. This action seeks to vindicate Plaintiff's rights in various musical compositions and sound recordings that Mr. Kenneth Anthony Wright created in the 1980s.

27. Mr. Wright is left with no choice but to file this lawsuit to seek: 1) his master recordings. 2) compensatory damages in the official amount owed and 3) 'punitive damages' for close to thirty-five (35) years of lost opportunities through deception.

28. This legal filing involves much more than a claim for royalties. It involves the misappropriation of stolen pre-tax income from the publishing rights of the above-named song with definite violations of non-reporting of royalties to the federal government. When a forensics examination of deposited royalty and publishing income is reviewed for Mr. And Ms. Alcarese and their numerous business entities, it will reveal a concerted attempt to conceal violations of the United States Tax Code. The IRS has "never" accused Mr. Wright of not reporting income from publishing rights to his song, which could only mean one thing: someone else has been depositing the 50% split of publishing income from the song "All Dis Music" from the date of its inception [1987 to 2021]. Not to mention the ongoing income from copyright royalties. That is defined by some as 'Tax fraud'.

29. Beyond an artist's cultural impact his legacy, in addition, has concrete financial value. This may be obvious to those in the music business but under closer inspection that very value is often subverted by means of theft & graft. Kenneth Anthony Wright's story is one such example of unfair gain by a corporate network of parent companies and subsidiaries, oceans apart on different continents. A parent company can no more dismiss the actions of its subsidiaries than a mother can dismiss crimes committed by her underage offspring.

30. 'Romance' pka Kenneth Anthony Wright's music story begins in Chicago, Illinois and traveled across the Atlantic Ocean to the international city of London, England. From there it migrated to mainland Europe, Asia, Australia, and parts unknown (precise information which is, in fact at present unavailable without extensive forensic accounting).

31. To calculate the compensatory damages owed to Mr. Wright for his song this would require an expansive financial forensics exercise which Mr. Wright intends to trigger through his cooperation with U.S. Federal authorities. There is initial recorded correspondence (which is critical evidence) from the British transnational conglomerate known as EMI. This evidence from that corporation established the fact that Mr. Alexander Alcarese, and Accountant (Lauren Alcarese) through their company DJ International Records/Pop Star Publishing, accepted royalty payments, unbeknownst to Mr. Wright, of proceed acquired from the profits derived from the song "All Dis Music". As Mr. Wright should have received these monies from Mr. And Ms. Alcarese starting in 1987 onward, also the taxes owed should have been paid. Since Mr. Wright had no knowledge of these monies at the time, either those taxes were never paid, or intentionally 'fraudulent' documents exist connected to these payments from EMI to and Mr. And Ms. Alcarese. This being through his official financial records, business entity and personal tax filings; business entity and personal bank deposits. This is a serious matter, and it can no longer be delayed or relegated to a simple royalty issue.

32. Defendants' deceptive acts or practices have proximately caused Plaintiff's actual damages in an amount to be determined at trial but believed to be greater than $975,000,000 (Nine-Hundred, Seventy-Five Million Dollars).

33. Defendants DJ International/Pop Star...and John Does 1-10 committed fraud, unjust enrichment, and breach of agreement with Malicious Intent beginning in 1987 - 2021 by failing to inform, notify, and provide Plaintiff with any knowledge that the song(s) created, arranged, produced, and performed by Plaintiff were secretly licensed, published, marketed and exploited numerous and multiple times throughout the world in various formats including but not limited to: vinyl album compilations, compact disc, cassette, "12" inch single, digital streaming and downloads that generated substantial amounts of revenue and global acclaim.

34. Defendants (1-10) breached the agreements by failing to account and share revenue derived from licensing and retail sales worldwide in the royalty rate of ten percent (10%) and publishing splits of fifty percent (50%) per licensing deals as described and evident in the agreements entered by and between Plaintiff and Defendants and failed to notify Plaintiff of any audits at any time as provided by the agreements entered into by Plaintiff and

Defendants beginning in 1987 - 2021. In addition to his actual damages, Plaintiff is entitled under the statute to reasonable Legal fees and costs.

35. 'All Dis Music' was originally released on the compilation 'House Sound of Chicago, Volume 3, Acid Tracks' in 1987 on FFRR/London Records and as a "12" single with House Music legend Francis Nicholls pka Frankie Knuckles 'Only the Strong Survive' in 1988 & 1992.

36. This record was manufactured, marketed, and distributed under the FFRR™ label over in the United Kingdom and became a hit classic Dance music anthem, first in England then spreading all through Europe and parts abound. The fact that this single was never released in North America, for the DJ International™ label it was produced under speaks to the secretive and clandestine nature of said label's owner regarding this song. Among the violations of Mr. Wright's legal rights are: "breach of contract", "fraud" and "unjust enrichment".

37. Mr. Wright seeks 'all' equitable remedies available for relief. In addition to the monetary damages of Nine Hundred and Seventy-Five Million Dollars ($975,000,000). Mr. Wright is requesting that all 'Master Recordings' of his song be relinquished and placed into his possession per his previous written request in 2019. "Adequate just relief" in this case require more than a mere transfer of money.

38. To satisfy the injury against Mr. Wright, the court should go above and beyond compensatory damages. A dollar amount for compensatory damages was derived in part through documented segments of an online digital revenue readout, plus the "compounding interest" on all ongoing revenue that should have been deposited in a secured account for (35) years. Full calculations will only happen ultimately when all evidence from discovery is presented to the court to come to an honest, equitable approximation. As for punitive damages the court can examine all the evidence and reach a just sum through the judge's discretion supported by existing precedent.

39. Mr. Wright's efforts to address DJ International's blatant and pervasive spread of his music without any regard to his ownership in copyright (equity stake in publishing, sales, licensing, and broadcasting revenues) and any other 'undiscovered exploitation' have been unsuccessful.

40. When the song "All Dis Music" was taken overseas in 1987 by DJ International, Mr. Wright had only done what is known as a 'test pressing' but had departed from Chicago with a verbal understanding that Mr. Alexander Alcarese and Accountant Lauren Alcarese (the label owners of DJ International) would contact him through phone or written correspondence on the "formal progress" of his song.

41. Although Mr. and Ms. Alcarese took unsanctioned measures to release the unfinished pieceof music to market, along with songs by other artists, who unlike Mr. Wright, knew their completed tracks would be officially released, Mr. and Ms. Alcarese never volunteered these important facts to Mr. Wright. The success of the compilation vinyl album "The House Sound of Chicago: Volume lll Acid Tracks" led to a sampler promo in 1988 of a 12inch single with "All Dis Music" as a B-side of "Only the Strong Survive" by the legendary House Music artist Frankie Knuckles (né Francis Nicholls).

## COUNT I (DECLARATORY JUDGMENT – FRAUD ON COPYRIGHT OFFICE – RECORDINGS) (Against All Defendants)

42. Plaintiff, repeat and reallege the allegations in Paragraphs 1 through 41, as if fully set forth herein.

43. Mr. Wright is now and at all relevant times has been the owner of the copyrights in the Recording "All Dis Music.

## COUNT II (WILLFUL DIRECT COPYRIGHT INFRINGEMENT OF THE COMPOSITIONS) (Against All Defendants)

44. Plaintiff, repeat and reallege the allegations in Paragraphs 1 through 43, as if fully set forth herein.

45. Mr. Wright is an author and owner of the copyrights in and to the Compositions entitled "All Dis Music" (the "Infringed Compositions") for which copyright registrations were issued to them in 1986 bearing Registration Nos.: SRu000100565 /1986-10-14 (the "Wright PA Registrations").

46. As the owner of the copyrights in the Infringed Compositions, Mr. Wright has the exclusive rights under the Copyright Act, among other things, to produce, manufacture, transmit and/or distribute Phonorecords embodying them.

47. Defendant's conduct, either directly and/or through third parties, constitutes an infringement of Plaintiffs' musical composition copyrights for "All Dis Music".

48. Plaintiff duly satisfied the statutory requirements regarding registration and deposit of the Infringed Copyrights upon which the alleged infringements are based pursuant to 17 U.S.C. §§ 407 and 411 as well as other statutory formalities required under the Copyright Act.

49. At various times during the three-year period prior to the commencement of this action, Defendants, individually and/or collectively, have copied and mechanically reproduced the Infringed Compositions in full, and distributed, sold, and/or licensed both physical and digital copies of the Infringed Compositions, all without authorization or consent of Mr. Wright.

50. Defendants, individually and/or collectively, were without any license or other form of permission, whether expressed or implied, to copy, reproduce, duplicate, perform, record, sell, use, transmit or distribute the Infringed Compositions.

51. By reproducing, manufacturing, distributing, transmitting, and selling copies of the Infringed Compositions without any license or other form or permission, the Defendants have infringed Plaintiffs' rights in violation of the Copyright Act.

52. The Defendant's, individually and/or collectively acts were in knowing and reckless disregard of Plaintiff's rights in and to the Infringed Compositions, and such infringements were willful as that term is defined in the Copyright Act.

53. As a direct result of the Defendants, individually and/or collective infringement of the Infringed Compositions, Plaintiff is entitled to their actual damages with respect to each of the Infringed Compositions, including the Defendants' profits from such infringements, as will be proven at trial.

*Digital Music News illustrated the issue addressed in this lawsuit with a recent posting on their website that:  The underlying lawsuit between Atlanta, Georgia-headquartered Cox Communications and the RIAA initiated in late July of 2018, when the major labels formally alleged that Cox had reaped substantial profits from "massive copyright infringement committed by thousands of its subscribers." A jury in late December of 2019*

*agreed with the plaintiffs, finding Cox Communications guilty of both vicarious and contributory infringement on some 10,017 works – and attaching a $99,830.29 fee to each of the alleged violations, bringing the grand damages total to just over $1 billion. (The amount was rounded down to $1 billion even on the "total damages" line.) Then, in early June of 2019, U.S. District Judge Liam O'Grady dismissed the majority of Cox's challenges against the stunning verdict but indicated that the disclosed total of 10,017 allegedly infringed works may have been "premature."*

54. Alternatively, Plaintiff is entitled to the maximum of statutory penalties under 17 U.S.C. § 504, in the amount of $150,000 with respect to each timely registered work that was infringed, to disgorgement of Defendants' profits, and to all other relief the Court deems just and proper under the law.

55. Plaintiff is also entitled to the costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505. Defendant's, individually and/or collective conduct has caused, and unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be compensated or measured in money. Plaintiff has no adequate remedy at law.

56. Pursuant to 17 U.S.C. §502, Plaintiff is entitled to a permanent injunction prohibiting further infringement of the Infringed Compositions.

57. Plaintiff's First Amended Complaint pursuant to 17 U.S.C. §505 relating to the infringements of All Dis Music, and (iv) entering such further relief that this Court deems just and appropriate, as well as Plaintiff's costs, including reasonable attorney's fees as provided by statute, and interest on its damages at the legal rate.

**WHEREFORE**, Plaintiff, respectfully prays that the Court find in his favor and enter an order and judgment as follows: finding ALL DEFENDANTS liable for direct infringement of Plaintiff's musical composition copyrights in All Dis Music and (i) awarding actual damages pursuant to 17 U.S.C. §504(b), including Defendants' profits, in such amounts as may be found; or (ii) in the alternative and at Plaintiff's election relating to the infringements of All Dis Music, statutory damages pursuant to 17 U.S.C. § 504(c) in the maximum amount allowed by law, (iii) awarding Plaintiff the costs of this action, including reasonable attorney's fees.

## COUNT III CONTRIBUTORY COPYRIGHT INFRINGEMENT (Against ALL Defendants)

58. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 57, as if fully set forth therein.

59. At various times during the three-year period prior to the commencement of this action, the Infringed Compositions have been and continue to be illegally reproduced, published, licensed and/or sold and distributed without Plaintiff's authorization in violation of 17 U.S.C. § 101 et seq.

60. Plaintiff, own the copyrights in the Infringed Compositions which have been infringed by the Defendants as hereinabove alleged.

61. Defendants, individually and/or collectively are secondarily liable under the Copyright Act for such infringing acts, including for the direct infringement of Plaintiff's exclusive rights by Defendants.

62. Defendants, individually and/or collectively induced, caused, participated in, aided, and abetted and/or materially contributed to the infringing conduct by Defendants.

63. Defendants, individually and/or collectively are liable as a contributory copyright infringer. The Defendants had actual and constructive knowledge of the infringing activity that occurred and is occurring with respect to the Infringed Compositions, and induced, caused, participated in, aided and abetted and/or materially contributed to such infringing conduct by Defendants.

64. The foregoing acts of infringement by Defendants individually and/or collectively have been willful, intentional, and purposeful, in disregard of and indifference to Plaintiff's rights.

65. As a direct and proximate result of such infringement of Plaintiff's copyrights and exclusive rights under copyright, Plaintiff, is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each of the Infringed Compositions or such other amounts as may be proper.

66. Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff is entitled to actual damages with respect to each of the Infringed Compositions, including Defendants' profits from such infringements, in such amounts as will be proven at trial.

67. Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated for or measured in money. Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff respectfully prays that the Court find in his favor and enter an order and judgment as follows: finding ALL DEFENDANTS liable for contributory infringement of Plaintiff's musical composition copyrights in All Dis Music, and (i) awarding actual damages pursuant to 17 U.S.C. §504(b), including any profits of Defendants, individually and/or collectively, in such amounts as may be found; or (ii) in the alternative and at Plaintiff's election relating to the infringements of All Dis Music, awarding statutory damages pursuant to 17 U.S.C. § 504(c) in the maximum amount allowed by law; (iii) relating to the infringements of All Dis Music, awarding Plaintiff the costs of this action, including reasonable attorney's fees, pursuant to 17 U.S.C. §505; and (iv) entering such further relief that this Court deems just and appropriate, as well as Plaintiff's costs, including reasonable attorney's fees as provided by statute, and interest on its damages at the legal rate.

## COUNT IV (BREACH OF CONTRACT)
### (By Wright Against ALL Defendants)

68. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 67, as if fully set forth herein.

69. Defendant SoundExchange's counsel stating that Plaintiff entered into agreements before a copyright was registered - Plaintiff submitted the copyright application (1-2) months prior to entering into DJ International/Pop Star Agreements and indeed informed DJ International Accountant 'Lauren Alcarese of this fact and that Plaintiff would provide a copy of the registration as soon as it was available from the Copyright Office.

*There should be an official date on record in the Copyright Office of the actual date the application was received for registration processing. You do not have to receive your certificate of registration before you publish or produce your work. Nor do you need permission from the Copyright Office to place a copyright notice on your work. But the Copyright Office must approve or refuse your application before you can file a lawsuit for copyright infringement, except in cases involving a non-U.S. work. *You may seek statutory*

*damages and attorney's fees in an infringement action provided that the infringement began after the effective date of registration. The law, however, provides a grace period of three months after publication during which full remedies can be recovered for any infringement begun during the three months after publication if registration is made before this period ends. Copyright Timeframe when submitting a registration application by mail… Mail Claims: application by paper form submission Claims with correspondence (approximately 69 percent of all Mail claims and 1 percent of all claims) average 3.6 months (but claims can range from <1 month to 7.9 months) average 9.5 months (but claims can range from 1.6 months to 17.4 months) average 14.5 months (but claims can range from 5.4 months to 23.5 months) average 11.3 months.*

70. Since in or about 1986, Defendants, individually and/or collectively and/or its successors in interest and/or persons or entities acting through them or under their authority (including without limitation Defendants, individually and/or collectively) have continued to exploit the Compositions and Recordings entitled "All Dis Music" (hereinafter the "Wright Works"), as to which Defendants were issued purported mechanical licenses, including without limitation, through the worldwide sale, license and/or distribution of those works in both physical formats as well as through digital service providers such as Spotify, iTunes, Band Camp, Soundcloud and YouTube.

71. Defendants, individually and/or collectively have failed and refused to pay and account to Mr. Wright for their exploitation of the Wright Works despite the contractual obligations to do so.

72. As a result, Mr. Wright has been damaged in an amount to be determined at trial but believed to be greater than $975,000,000.

**WHEREFORE**, Plaintiff respectfully prays that the Court find in his favor and enter an order and judgment as follows: awarding Wright compensatory damages against DEFENDANTS, INDIVIDUALLY AND/OR COLLECTIVELY for the material breach of contract in an amount to be proved at trial, but not less than $1,000,000, and entering such further relief this Court deems just and appropriate, as well as Plaintiff's costs, including reasonable legal fees as provided by statute, and interest on its damages at the legal rate.

## COUNT V (BREACH OF THE WARRANTY OF GOOD FAITH AND FAIR DEALING) (Against ALL Defendants)

73. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 72, as if fully set forth herein.

74. Defendants, individually and/or collectively have continued to exploit the Wright Works including, through the worldwide sale, license and/or distribution of those works in both physical formats as well as through digital service providers such as Spotify, iTunes, Band Camp, Soundcloud and YouTube.

75. Defendants, individually and/or collectively have failed and refused to pay or account for the exploitation of the Wright Works despite the contractual obligations to do so.

76. Defendants, individually and/or collectively have received substantial income from the exploitation of the Wright Works and have failed and refused to pay Mr. Wright his rightful (10%) royalty and (50%) publishing share of that income.

77. Defendants, individually and/or collectively have exercised any contractual rights they, or either of them, may have with respect to the Wright Works, arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties.

78. As a result, thereof, the Defendants breached the implied warranty of good faith and fair dealing that adheres to every contract as a matter of law.

79. As a result, thereof, Mr. Wright has been damaged in an amount to be determined at trial but believed no less than $1,000,000.

**WHEREFORE**, Plaintiff respectfully prays that the Court find in his favor and enter an order and judgment as follows: awarding Mr. Wright compensatory damages against ALL DEFENDANTS for the breach of the implied warranty of good faith and fair dealing in an amount to be proved at trial, but not less than $975,000,000, entering such further relief that this Court deems just and appropriate.

///

## COUNT VI (UNJUST ENRICHMENT)
### (Against All Defendants)

80. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 79, as if fully set forth herein.

81. Defendants, individually and/or collectively have continued to exploit the Wright Works including, through the worldwide sale, license and/or distribution of those works in both physical formats as well as through digital service providers such as Spotify, iTunes, Band Camp, Soundcloud and YouTube.

82. Defendants, individually and/or collectively have received substantial income from the exploitation of the Wright Works and have failed and refused to pay Plaintiff their rightful share of that income.

83. Defendants, individually and/or collectively have received money which belongs to Plaintiff under circumstances whereby in equity and good conscience they ought not keep it.

84. As a result, thereof, the Defendants have been unjustly enriched by its receipt and retainer of money otherwise belonging to Plaintiff in an amount to be determined at trial but believed to be more than $975,000,000.

**WHEREFORE**, Plaintiff respectfully prays that the Court find in his favor and enter an order and judgment as follows: awarding Plaintiff damages against ALL DEFENDANTS for unjust enrichment in an amount to be proved at trial, but not less than $975,000,000, and entering such further relief that this Court deems just and appropriate.

## COUNT VII (CONSTRUCTIVE TRUST)
### (By Wright Against All Defendants)

85. Plaintiff, repeats and realleges allegations in Paragraphs 1 through 84, as fully set forth herein.

86. Defendants, individually and/or collectively have received substantial income from the exploitation of the Wright Works and have failed and refused to pay Mr. Wright his rightful share of that income.

87. Defendants, individually and/or collectively have received money which belongs to Mr. Wright under circumstances whereby in equity and good conscience they ought not keep.

88. As a result, Defendants hold money otherwise belonging to Mr. Wright in constructive trust in an amount to be determined at trial but believed to be greater than $975,000,000.

**WHEREFORE**, Plaintiff respectfully prays that the Court find in his favor and enter an order and judgment as follows: against ALL DEFENDANTS, imposing a constructive trust in an amount to be proved at trial, but not less than $975,000,000, and entering such further relief that this Court deems just and appropriate.

## COUNT VIII (VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT) (By Plaintiff Against All Defendants)

89. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 88 as if fully set forth herein.

90. Defendants, individually and/or collectively have with malicious intent committed egregious and deceptive acts or practices, including, but not limited to, selling, and distributing to the public from their offices in Chicago, Illinois, physical recordings, and digital distribution (through streaming services or otherwise) of the Recordings under the representation that they owned and controlled such works. Such acts or practices were knowingly false, deceptive, and misleading.

91. Defendants, individually and/or collectively intended that the public rely on these deceptions in the purchasing of those physical records and/or licensing of such works via music streaming services.

92. Defendants, individually and/or collectively deceptive acts or practices occurred in a course of conduct involving trade or commerce, specifically the wrongful commercial exploitation of the Records.

93. Defendants, individually and/or collectively deceptive acts or practices have proximately caused Plaintiff's actual damages in an amount to be determined at trial but believed to be greater than $975,000,000. In addition to his actual damages, Plaintiff is entitled under the statute to reasonable legal fees and costs.

## COUNT VIII (FALSE UNSUBSTANTIATED ALLEGATIONS)
### (By Wright Against Defendant SoundExhchange's Answer to Plaintiff's Complaint)

94. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 93 as if fully set forth herein.

95. Defendant has falsely stated that Plaintiff isn't a Member of SoundExchange. Plaintiff is a member of SoundExchange in good standing since 2007 in which Defendant SoundExchange has remitted 'Featured Artist' check payments quarterly since in or around 2007 - 2021. Member ID # 1000002782.

96. Defendant SoundExchange evoked a (10) year Statute of Limitations rule for contracts in Illinois; however, Plaintiff was unaware that Defendant DJ International/Pop Star had published 'All Dis Music' in the year 1987 until in 2003 when, a colleague discovered it online. Defendant DJ International maliciously and intentionally lied to Plaintiff during phone conversations about the release status of the song both in 1988 and 1992 during those communications.

97. Defendant SoundExchange has falsely implied that Plaintiff assigned his rights to Defendant DJ International/Pop Star with no allotment or expectation of royalty payments and publishing split of revenue derived from Plaintiff's copyrighted works. As indicated therein, Plaintiff was entitled to (10%) of royalties for retail and (50%) split of publishing. (See Defendant SoundExchange EXHIBIT 1 (Sections 3, 5, and 6) of the 'DJ International Contract for Recording Artists' and EXHIBIT 2 (Section 7 C, E, and G) of the Exclusive Songwriter's Agreement (Compensation) and (Section 9) Accounting).

98. Defendant SoundExchange falsely claimed that Plaintiff entered into written agreements with Defendant DJ International/Pop Star prior to Plaintiff applying for copyright registration with the U.S. Copyright Office. Plaintiff did in fact duly submit to the Copyright Office a completed application, required application fees, cassette, and lyric sheet prior to acceptance and entering into contractual agreements with DJ International/Pop Star Publishing.

99. Plaintiff was asked by Defendant DJ International/Pop Star Accountant (Lauren Alcarese) on the day those agreements between Defendant DJ International/Pop Star and Plaintiff were being executed, if a copyright had been submitted to the Copyright Office by the

Plaintiff, in which Plaintiff informed (Alarese) that the application indeed had been already mailed to the Copyright Office, in which (Alcarese) immediately asked Plaintiff a second time "if the copyright had been submitted because the company (DJ International) didn't want any future claims of copyright infringement brought against them by anyone".

100.     Plaintiff did indeed assure (Alcarese) that the copyright application had been already mailed to the Copyright Office beforehand and (Alcarese) stated that the company would need Plaintiff to promptly provide a copy of the registered application as soon as it was available to the Plaintiff from the Copyright Office. Plaintiff did indeed provide the registered copy to Defendant DJ International promptly as requested.

101.     Defendant (SoundExchange) has falsely implied that Plaintiff assigned his rights to Defendant (DJ International/Pop Star Publishing) with 'no allotment or expectation of royalty payments and publishing split of revenue derived from Plaintiff's copyrighted works.' As indicated by the posted docket therein, Plaintiff is entitled to (10%) of royalties for retail and (50%) split of publishing. (See Defendant (SoundExchange) EXHIBIT 1 (Sections 3, 5, and 6) of the 'DJ International Contract for Recording Artists' and EXHIBIT 2 (Section 7 C, E, and G) of the Exclusive Songwriter's Agreement (Compensation) and (Section 9) Accounting).

102.     Defendant (SoundExchange) falsely claimed that Plaintiff entered into written agreements with Defendant) DJ International/Pop Star Publishing) prior to the Plaintiff applying for copyright registration with the U.S. Copyright Office. Contrary to (SoundExchange's) claims Plaintiff did in fact duly submit to the Copyright Office a completed application; required application fees; cassette; and lyric sheet prior to acceptance and entering into any contractual agreements with (DJ International/Pop Star Publishing).

103.     Plaintiff was asked by Defendant (DJ International/Pop Star Publishing) Accountant (Lauren Alcarese) on the day those agreements between Defendant (DJ International/Pop Star Publishing) and Plaintiff were being executed, if a copyright had been submitted to the Copyright Office by the Plaintiff, in which Plaintiff responded ( to Alcarese) that the application indeed had been already mailed to the Copyright Office, upon which (Alcarese) immediately asked Plaintiff a second time "if the copyright had been

submitted because the company (DJ International) did not want any future claims of copyright infringement brought against them by anyone."

104.     Plaintiff did indeed assure (Alcarese) that the copyright application had been already mailed to the Copyright Office beforehand and (Alcarese) stated that the company would need Plaintiff to promptly provide a 'copy' of the registered application as soon as it was available to the Plaintiff from the Copyright Office. Plaintiff did indeed provide the registered copy to Defendant (DJ International) promptly as requested.

105.     Defendant (SoundExchange) falsely stated that the Plaintiff only began inquiries into the matter of this Complaint in 2014. Plaintiff did begin to immediately inquire to (EMI) (the Administrator) on or around August 31, 2005, in which ascertained that several attempts to correspond with Defendant (DJ International/Pop Star) were unsuccessful. (See Plaintiff Exhibit 1 Correspondence: (Defendant SoundExchange Memorandum) allegation of Plaintiff's Inquiries starting in 2014 - Plaintiff purportedly became aware of the allegedly unlawful activity and began making "several inquiries…regarding this matter" to the Defendants (EMI in 2005) and (SoundExchange no later than January 27, 2014). (Plaintiff's Objection, Dkt. 15; see Cmplt. at ¶ 37.)

106.     Plaintiff did indeed as a matter of fact begin inquiring to EMI and other Defendants at or around 2005. Defendant DJ International/Pop Star blatantly ignored several attempts made by EMI to correspond regarding this matter beginning in 2005. Plaintiff was misled with false promises and "brushed off" by Defendants who stated on numerous occasions that they would investigate the matter and follow up with Plaintiff beginning in 2005.

107.     Plaintiff has been more than patient with all Defendants for nearly (35+) years for accountability to no avail. Plaintiff has contacted the FBI, New York State Attorney, Illinois State Attorney, ASCAP, BMI, Harry Fox Agency, Lawyers for the Creative Arts, Defendants (1-10), Illinois Cook County Commission Board Member politician Jerry Butler, Music Advocates, Mr. Clarence Avant, Supreme Songs™, and finally numerous attorneys seeking help to little or no avail regarding this matter. Defendants have failed to address this matter promptly while allowing years to lapse although the same Defendants continue with unlawful exploitation, in violation, of Plaintiff's rights under Copyright law.

108.     Defendant SoundExchange's Counsel has hereby, falsely claimed to have no present membership affiliation agreement with the Plaintiff.

109.     Counsel for SoundExchange Laura K. McNally should be barred from this case as she presently has a 'conflict of interest' due to her informing the Plaintiff of her Volunteer status at the United States District Court for the Northern District of Illinois where this case is being litigated. Such a position of inside status within the Courts gives Attorney McNally an undue influence and her client an unfair access over the process. In addition, the Plaintiff has discovered the law firm Loeb & Loeb which Attorney McNally along with the law firm's New York litigator, Attorney Barry Slotnick forwarded this case to the Chicago office after initial contact. Loeb & Loeb has previously represented three of the major Defendants (Universal Music, EMI Music and Peer Music), and calls into question what their current relationship with these corporations are.

110.     The U.S. Marshals were ordered by the court to serve Summons to each Defendant and have not done so. Apart from Defendant SoundExchange, each Defendant has failed to answer to the lawsuit within the time period provided by the court, although each Defendant was duly served Summons via electronic means on October 25, 2021. It would appear they are in Default. Defendant SoundExchange's Counsel Attorney McNally has even made mention in the court docket that they're "the only Defendant that satisfied the court with a response" to the Complaint. The not-so-subtle implication is that the other Defendants were aware of this filing yet have chosen to ignore the serious nature of this case, with no regard to the rights of the Plaintiff nor the order set forth by the Court.

111.     The Court accepted the Defendant SoundExchange's 'Motion for Extension of Time' entered in the Court docket on December 15, 2021 and did grant their request of time extension. Under this provision, it should be acceptable that service of Summons was duly provided to each Defendant on October 25, 2021, as recorded on the Court docket.

112.     Plaintiff contacted the U.S. Marshals Los Angeles Branch respectively by phone on or around November 10, 2021, and promptly submitted the Court Order, Summons, along with the Complaint to Deputy Bravo along with the completed USM-285 forms for each Defendant. Plaintiff was instructed to wait for the 'Notices of Service' to be returned to Defendant by the Marshals. Plaintiff contacted Deputy Bravo on February 2, 2022 and inquired on the status of said 'Status of Service' and was instructed to contact the Illinois Marshals Office, because the Illinois branch was supposed to be processing the Order of service and that if Plaintiff hadn't received a reply from the Illinois branch by February 7,

2022, Deputy Bravo would send them an email regarding the matter. Plaintiff called the Court Clerk on February 7, 2022, also and was instructed by the person answering the phone, 'Kim,' to call the Illinois Marshals and request a 'Status of Service'.

113.     Plaintiff left (2) voicemail messages on the Illinois Marshals office phone number on February 3, 2022, and on February 7, 2022, as instructed. Plaintiff then received a voicemail message from Deputy Blake (Illinois) on or around February 10, 2022, stating that the marshals were not ordered to serve the Defendants because there were "several Defendants" and that Plaintiff has the option to utilize a different Process of Service provider.

114.     Counsel for the Defendants: SoundExchange, Peer Music, and DJ International/Pop Star have acknowledged the lawsuit in their email communication to the Plaintiff. Both Peer Music and DJ International have ignored deadlines set forth by the Court but chose instead to communicate with the Plaintiff through email. The failures of those Defendants and (1-10), to provide an official response to the court clearly supports all claims made against them in the Complaint.  That they have ignored this matter with malicious intent, it consequently continues to cause irreparable harm to the Plaintiff.

115.     Plaintiff presently awaits 'Status of Service' from Illinois U.S. Marshals for Defendants (1-10) except for Defendant 'SoundExchange' as to the December 19, 2021, court-ordered deadline answer to Complaint. Plaintiff spoke with Deputy Bravo of the Los Angeles U.S. Marshals on February 1, 2022, and February 7, 2022, and presently await correspondence regarding email inquiry with the Illinois U.S. Marshals. Plaintiff also spoke with 'Kim' at the Illinois Federal court Clerk's office on February 4, 2022, regarding the same inquiry 'Status of Service'. Plaintiff has attempted to correspond with Defendants (1-10) without recourse to little or no avail as demonstrated in Exhibits attached (Defendants Correspondence). Plaintiff has documented that the song did indeed generate substantial and significant revenue as evident in attachment (Revenue).

116.     Defendant DJ International/Pop Star blatantly ignored several attempts made by EMI to correspond regarding this matter beginning in 2005. Plaintiff was misled with false promises and "brushed off" by Defendants who stated on numerous occasions that they'd look into the matter and follow up with Plaintiff beginning in 2005. Plaintiffs have been more than patient with all Defendants for nearly (35+) years for accountability to no avail.

Plaintiffs have contacted the FBI, New York State Attorney, Illinois State Attorney, ASCAP, BMI, Harry Fox Agency, Lawyers for the Creative Arts, Defendants (1-10), Illinois Council Member Jerry Butler, Music Advocates, Clarence Avant, Supreme Songs, numerous attorneys, seeking help to little or no avail regarding this matter. Defendants have failed to address this matter promptly while allowing years to lapse although Defendants continue with the unlawful exploitation in violation of Plaintiff's rights under Copyright law.

117.    Defendant SoundExchange hereby has falsely claimed to have no membership affiliation agreement with Plaintiff. Counsel for SoundExchange should be barred from this case as a 'conflicting interest' counsel due to formerly and/or presently being a Volunteer at the Eastern District court where this case is being litigated because such position gives Counsel an unfair advantage over the Plaintiff.

118.    The U.S. Marshals were ordered by the court to serve Summons to each Defendant and have not done so. Apart from Defendant SoundExchange, each Defendant has failed to answer to the lawsuit within the time period provided by the court although each Defendant was duly served Summons via electronic means on October 25, 2021, and therefore are in Default. Defendant SoundExchange have even made mention to the court docket that "they're the only Defendant that satisfied the court with a response" to the Complaint which implies that the other Defendants are aware of this filing yet, have chosen to ignore the serious nature of this case with no regard to the rights of the Plaintiff nor order set forth by the Court. The Court accepted the Defendant SoundExchange's 'Motion for Extension of Time' entered in the Court docket on December 15, 2021, and did grant their request of time. Under this provision, it should be acceptable that service of Summons was duly provided to each Defendant on October 25, 2021, as recorded on the Court docket.

119.    Plaintiff contacted the U.S. Marshal's Los Angeles Branch respectively on or around November 10, 2021, and submitted the Court Order, Summons, and Complaint to Deputy Bravo along with the completed USM-285 forms for each Defendant and was instructed to wait for  the 'Notices of Service to be returned to me by the Marshals. Plaintiff contacted Deputy Bravo on February 2, 2022, and inquired on a 'Status of Service' and was instructed to contact the Illinois Marshal's Office because the Illinois branch was processing the Order of service and that if Plaintiff hadn't received a reply from the Illinois

branch by February 7, 2022, Deputy Bravo would send them an email regarding the matter. Plaintiff called the Court Clerk on February 7, 2022, also and was instructed by 'Kim' to call the Illinois Marshals and request a 'Status of Service'. Plaintiff left (2) voicemail messages on the Illinois Marshal office phone number on February 3, 2022, and also on February 7, 2022, as instructed and received a voicemail message from Deputy Blake (Illinois) on or around February 10, 2022, stating that the Marshals were not ordered to serve the Defendants because there were several Defendants, and that Plaintiff has the option to utilize a different Process of Service provider.

120.     Counsel for the Defendants SoundExchange, Peer Music, and DJ International/Pop Star have acknowledged the lawsuit in their email communication to the Plaintiff while ignoring deadlines set forth by the Court. The failures of those Defendants and (1-10) clearly support the claims made against them in the Complaint that they've ignored this matter with malicious intent to continue causing irreparable harm to the Plaintiff.

121.     Plaintiff presently awaits 'Status of Service' from Illinois U.S. Marshals for Defendants (1-10) except for Defendant 'SoundExchange' as to the December 19, 2021, court-ordered deadline answer to Complaint.

122.     Plaintiff spoke with Deputy Bravo of the Los Angeles U.S. Marshals on February 1, 2022, and February 7, 2022, and presently await correspondence regarding email inquiry with the Illinois U.S. Marshals. Plaintiff also spoke with 'Kim' at the Illinois Federal court Clerk's office on February 4, 2022, regarding the same inquiry 'Status of Service'.

123.     Plaintiff has attempted to correspond with Defendants (1-10) without recourse to little or no avail as demonstrated in Exhibits attached (Defendants Correspondence).

124.     Plaintiff has documented that the song did indeed generate substantial and significant revenue as evident in attachment (Revenue).

*Rulings on related proceedings: The Copyright Act's separate-accrual rule: under this rule a new infringement arises each time a work is reproduced or distributed, triggering the statute-of-limitations period anew. In addition, under the "continuing harm doctrine", there may be liability for content that is posted years ago but remains online, such as an image posted to a social media account that is not taken down. [13] See Chi. Bldg. Design, P.C. v. Mongolian House, Inc., 770 F.3d 610, 618 (7th Cir. 2014) (plaintiff alleged infringing acts that all occurred within three years prior to the suit); Energy Intelligence*

*Grp., Inc v. Kanye Anderson Capital Advisors, L.P., 948 F.3d 261, 271 (5th Cir.2020) (considering whether mitigation is an absolute defense to statutory damages under the Copyright Act). 2019: Jamaican singer/songwriter Michael May, aka Flourgon, launches legal action against the pop superstar in May 2018, claiming her single was heavily inspired by his 1988 track "We Run Things," which he insists was a big hit in the Caribbean. He took issue with one repeated line in Cyrus' release in which she sings, "We run things, things don't run we," arguing that it's strikingly similar to his lyric, "We run things, things no run we." He sued Cyrus and her label bosses at Sony Music to block further distribution, sales, and performances of 'We Can't Stop,' and demanded compensation to the tune of $300 million. The 26-year-old denied any wrongdoing and insisted the turn of phrase isn't unique enough to be protected by copyright laws, but in February, US Magistrate Judge Robert Lehrburger recommended U.S. District Judge Lewis Kaplan, who was assigned to the case in federal court, deny Cyrus' bid to have the suit tossed. Judge Kaplan delivered his official ruling on the matter following his colleague's advice by allowing the case to continue, after determining he defendants' argument for fair use of the lyric, and that the two tracks are "not substantially similar," were "without merit," reports Billboard.*

125.     Taking all of this into consideration the above news item is an example of one artist who is the Defendant borrowing (without permission) lyrics from another who is the Plaintiff. In the case of Wright v. DJ International Records/Pop Star Publishing it must be said that this is out-and-out theft, without question. A segment of revenue documented from a few months' worth of streaming from 2011 for the song "All Dis Music" is provided as proof of enormous monetary profits from the song. 'Digital revenue' is by far the most lucrative 21st Century currency for the 'merchants' of music. This is achieved through an assortment of websites on different servers from continents spanning the globe. Through discovery, even within the current three-year window, at minimum, the initial stated damages will be vindicated. *See Michael May v. Miley Cyrus Michael May v. Miley Ray Cyrus, et al. S.D.N.Y., 2018, cv-2238, Complaining Work     Defending Work, Michael May, "We Run Things" Audio Recording, Miley Ray Cyrus "We Can't Stop" Audio Recording Updated Comment by Awani Kelkar.* On Feb 13, 2019, US Magistrate Judge. Robert W. Lehrburger denied Miley Cyrus's motion to dismiss Jamaican songwriter

Michael May's complaint. He also determined, however, that defendants should be permitted to limit pre-filing damages to a three-year period. The entire report is premised on a strict application of two legal principles: 1) reasonable inferences should be drawn in the plaintiff's favor and 2) a motion to dismiss should not be granted when further factual development is required. While admitting that the defendants might ultimately prevail on defenses of lack of originality in the phrase 'We run things, things don't run we' and fair use, Judge Lehrburger nevertheless concluded that 'the court cannot make that determination on this motion.'

126.    On the issue of originality, Judge Lehrburger suggests that the phrase 'We run things, things don't run we' is a combination of "Wi run tings. Tings nuh run wi", the original Patois saying, and creative usage of the English language. While the standard English version appears to be is a mere translation of the patois, Lehrburger contends that 'alleging what the Phrase would read as in Jamaican Patois suggests a hypothetical.' Elsewhere in his report, however, he notes that 'if May applied for copyright protection for the Phrase alone, he likely would be denied.' But he also suggests that since the allegedly copied phrase forms the 'heart of May's song,' and features significantly in Cyrus's rendition, the copying is substantial, based on the similarity of the phrases, not the songs.

127.    In response to Lehrburger's findings, on Feb 27, 2019, the defendants filed written objections to this Report. Their main objections are that: 1) in determining similarity a holistic comparison of the two songs must be made, not merely phrases of them and 2) The phrase in question cannot be protected by copyright law and 3) there is no basis for a fragmented literal similarity claim and 4) a dismissal should be granted since defendants can establish fair use.

128.    In June 2019 Judge Lewis Kaplan of the US District Court, Southern District New York, rejected these objections lodged in defendants' motion to dismiss the complaint. He did, however, preclude a possible award to plaintiff of statutory damages and attorney's fees associated with any alleged infringement occurring prior to the date on which the plaintiff obtained a copyright registration for the complaining work.

*Comment by Charles Cronin: "The most impressive aspect of the Complaint is its length – a meandering ramble of nearly 30 pages – and the fact that it involves a plaintiff from the nation of Jamaica represented by someone from the neighborhood of Jamaica (best known*

*as the LIRR transfer station for the JFK shuttle). Most of its content is irrelevant and repetitive information about the financial success (the true motivation of this claim) of Miley Cyrus, and her handlers' canny transformation of her public image from a tween TV character (waning popularity and profitability of "Hannah Montana") into a more lucrative jade (resulting in the term "skanky" surfacing in a great number of sites Google retrieves for searches of her name).*

*The embarrassingly feeble basis of the infringement claim is that the disputed songs share variants of the unprotectable phrase "we run things; things don't run us." This expression is, apparently, commonly heard in the plaintiff's Jamaica – no doubt a sentiment stemming from Spain and England's centuries of colonization and enslavement on the island. But Complaint's attempts to manufacture a claim from this insignificant commonality verge on incoherent: ¶ 53 "… In Defendants' substantially similar lyrical and thematic version, Plaintiff May's original, creative and unique lyrical phrase is repeated by Defendants using the literal English translation, but substantially similar phraseology to Plaintiff May's, while wholly maintaining the unique Patois phraseology, "We run things. Things don't run we."*

129.    Successful pop music performers, and the companies associated with them, should not settle contrived claims like this one. Doing so may seem financially expedient for the defendants, but contingency-fee plaintiff attorneys (typically lacking the resources and experience for full-blown litigation) precisely seek these quick payoffs, and such capitulation only encourages similarly motivated allegations against other financially successful entertainers.

**WHEREFORE**, Plaintiff respectfully prays that the Court find in his favor and enter an order and judgment as follows: against ALL DEFENDANTS a judgment that the Defendants' conduct violates the Illinois Consumer Fraud Act and imposing damages in an amount to be proved at trial, but not less than $975,000,000, and entering such further relief as this Court deems just and appropriate, as well as Plaintiff's costs, including reasonable legal fees as provided by statute, and interest on its damages at the legal rate. Plaintiff has suffered losses of irreplaceable personal property at storage units over the course of years (1987 - 2022) on numerous occasions due to economic disparities

including: music equipment (guitars, keyboards, digital studios, headphones, microphones, drum machines, audio & video tapes, CD, 8mm disks, cables, camcorders, sound files containing original songs, laptop and Mac computers, printer, clothes, tools, furniture, bedding, DVD's, family photos, obituaries, books, paintings, jewelry, rare albums, copyright catalogues, dishware, grills, legal documents and financial records, etc. Plaintiff endured the pain, trauma, and heartache of watching my parents pass away in impoverished conditions (my father on November 4, 2004 & my mother on September 23, 2014). Both of whom Plaintiff could have provided better and certainly adequate care for their health. Finally, the death of my beloved pet dog of more than (11) years on November 23, 2021, in which case Plaintiff was financially unable to provide necessary medical treatment and care for. Had it not been for the intentional neglect to address this matter by the Defendants this dishonest display of ignorance their lives likely could have been prolonged. Plaintiff incurred more than $13K in student loan debt caused by economic disparity instead of taking out student loans to further education of Plaintiff. Plaintiff ended up facing eviction and became homeless resulting from economic disparity caused by monies stolen and unlawfully withheld from Plaintiff by Defendants. Plaintiff lost opportunities to engage with fans abroad for more than (35+ years) of my youth during the heyday of Plaintiff, including losses of potential income opportunities from worldwide tours and live engagements, collaborations, endorsements, movie deals and appearances, loss of potential business investment opportunities, etc. Plaintiff suffered from the lack of optimal healthcare and necessary medical treatments due to economic disparity. Plaintiff suffered stress, high blood pressure, depression, nervousness, sleeplessness, poor diet, etc., because of economic disparity.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demand a trial by jury of all issues which are so triable.

Respectfully submitted:                              Date: 3/21/22
/s/Kenneth Wright Plaintiff Pro Se
P.O. Box 20174 Long Beach, CA 90802
(562) 285-2421
Kennethw524@gmail.com

**CERTIFICATE OF SERVICE**

I, Kenneth Wright, Pro Se, hereby certify that on March 21, 2022, I electronically filed the attached **Plaintiff's First Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.


Respectfully submitted:

/s/Kenneth Wright

Plaintiff Pro Se

P.O. Box 20174

Long Beach, CA 90802

(562) 285-2421

Kennethw524@gmail.com