**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 1:21-cv-5085 |
| v. | ) | |
| | ) | Judge Franklin U. Valderrama |
| DJ INTERNATIONAL RECORDS, ASCAP, | ) | |
| POP STAR PUBLISHING, LONDON | ) | Magistrate Judge Sheila M. |
| RECORDS/FFRR, BOLLORÉ SE, | ) | Finnegan |
| VIVENDI SE, THE SEAGRAM | ) | |
| COMPANY LTD., WARNER BROS., | ) | |
| HARMLESS RECORDS, POLYDOR | ) | |
| JAPAN, VIRGIN EMI, DEMON MUSIC, | ) | |
| PEERMUSIC, SOUNDEXCHANGE, | ) | |
| SPOTIFY, BMI AND UNIVERSAL | ) | |
| MUSIC GROUP, AND JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT SOUNDEXCHANGE, INC.'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.   PRELIMINARY STATEMENT ...............................................................................1

II.  BACKGROUND.......................................................................................................2

III. LEGAL STANDARD................................................................................................5

IV.  ARGUMENT.............................................................................................................5

A.   THE FAC FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE
     GRANTED. ........................................................................................................5

      1.   Plaintiff's State Law Claims Fail Because Plaintiff Has Not Alleged Any
          Wrongful Conduct by SoundExchange. ...................................................5

      2.   Plaintiff's Copyright Claims Fail Because Plaintiff Cannot Establish Ownership
          of a Valid Copyright. ................................................................................8

B.   THE FAC IS BARRED BY THE APPLICABLE STATUTES OF
     LIMITATION. ..................................................................................................11

C.   FURTHER AMENDMENT WOULD BE FUTILE AND THE FAC SHOULD
     BE DISMISSED WITH PREJUDICE..............................................................14

V.   CONCLUSION........................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambrosius v. Chi. Ath. Clubs, LLC*,
　　No. 1-20-0893, 2021 Ill. App. LEXIS 554 (Ill. App. 1st Sept. 30, 2021) ................................8

*Armstrong v. Guigler*,
　　673 N.E.2d 290 (Ill. 1996) .......................................................................................................11

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009)....................................................................................................................5

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544 (2007)....................................................................................................................5

*Bell v. Chi. Cubs Baseball Club, LLC*,
　　No. 19-cv-2386, 2020 U.S. Dist. LEXIS 17527 (N.D. Ill. Feb. 4, 2020) .........................2, 5, 8

*Blue Book Servs. v. Farm Journal, Inc.*,
　　435 F. Supp. 3d 912 (N.D. Ill. 2020) .........................................................................................3

*Bogie v. Rosenberg*,
　　705 F.3d 603 (7th Cir. 2013) ...................................................................................................14

*Brinley Holdings, Inc. v. Husch Blackwell LLP*,
　　No. 19-cv-05242, 2022 U.S. Dist. LEXIS 3462 (N.D. Ill. Jan. 7, 2022)..............................6, 7

*Estate of Brown v. ARC Music Grp., Inc.*,
　　830 F. Supp. 2d 501 (N.D. Ill. 2011), *aff'd*, 523 F. App'x 407 (7th Cir. 2013) ........7, 8, 11, 13

*Chi. Title Land Tr. Co. v. Potash Corp. of Sask. Sales Ltd.*,
　　No. 1-12-3550, 2013 Ill. App. Unpub. LEXIS 1662 (Ill. App. 1st Jul. 31, 2013)..................12

*Consumer Health Info. Corp. v. Amylin Pharms., Inc.*,
　　819 F.3d 992 (7th Cir. 2016) ...................................................................................................14

*Direct Energy Bus., LLC v. City of Harvey*,
　　No. 1-20-0629, 2021 Ill. App. LEXIS 247 (Ill. App. 1st May 18, 2021) .................................6

*Energy Intelligence Grp. v. Exelon Generation Co.*,
　　No. 20-cv-3983, 2021 U.S. Dist. LEXIS 76688 (N.D. Ill. Apr. 21, 2021)..............................14

*Gardner v. Cole*,
　　No. 4-13-0002, 2013 Ill. App. Unpub. LEXIS 2389 (Ill. App. 4th Oct. 24, 2013) ..................7

*Hart v. Amazon.com, Inc.*,
   191 F. Supp. 3d 809 (N.D. Ill. 2016), *aff'd*, 845 F.3d 802 (7th Cir. 2017) ............................15

*Hassebrock v. Ceja Corp.*,
   29 N.E.3d 412 (Ill. App. 5th 2015) ......................................................................................11

*Hatcher v. Hatcher*,
   158 N.E.3d 326 (Ill. App. 3d 2020) ........................................................................................6

*Held v. Held*,
   137 F.3d 998 (7th Cir. 1998) ................................................................................................13

*Hoover v. Country Mut. Ins. Co.*,
   975 N.E.2d 638 (Ill. App. 3d 2012) ......................................................................................11

*Kaiser v. Fleming*,
   735 N.E.2d 144 (Ill. App. 2d 2000) ....................................................................................7, 8

*Kast v. Chrysler Corp.*,
   No. 96 C 6657, 1997 U.S. Dist. LEXIS 7769 (N.D. Ill. May 27, 1997) ......................... 10-11

*Martin Cartage & Express, Inc. v. Arthur J. Gallagher & Co.*,
   No. 2-11-1271, 2012 Ill. App. Unpub. LEXIS 1671 (Ill. App. 2d Jul. 10, 2012)...................12

*Mosier v. Vill. of Holiday Hills*,
   128 N.E.3d 1210 (Ill. App. 2d 2019) ....................................................................................13

*Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*,
   870 F.3d 682 (7th Cir. 2017) ............................................................................................14-15

*Robinson v. Toyota Motor Credit Corp.*,
   775 N.E.2d 951 (Ill. 2002) ......................................................................................................8

*Rush Univ. Med. Ctr. v. Draeger, Inc.*,
   No. 17 C 6043, 2017 U.S. Dist. LEXIS 189588 (N.D. Ill. Nov. 16, 2017) ............................13

*Saletech, LLC v. E. Balt, Inc.*,
   20 N.E.3d 796 (Ill. App. 1st 2014) .....................................................................................6, 7

*Scholz Design, Inc. v. Jaffe*,
   488 F. Supp. 2d 749 (N.D. Ill. 2007) ....................................................................................11

*Smith v. Convergent Outsourcing, Inc.*,
   539 F. Supp. 3d 929 (N.D. Ill. 2021) ....................................................................................15

*Stavrinides v. Vin De Bona*,
   No. 2:18-cv-00314-CAS(JPRx), 2018 U.S. Dist. LEXIS 41305 (C.D. Cal. Mar. 12, 2018) ..10

*Sundance Homes v. Cty. of Du Page*,
　746 N.E.2d 254 (Ill. 2001) ................................................................................13

*Travelers Cas. & Sur. Co. v. Bowman*,
　893 N.E.2d 583 (Ill. 2008) ...............................................................................12

*Vermette v. Cozad Asset Mgmt.*,
　No. 4-19-0354, 2020 Ill. App. Unpub. LEXIS 475 (Ill. App. 4th Mar. 19, 2020) ..................6

*W. Consol. Premium Props. v. Mc Risk Servs. LLC.*,
　No. 12 C 3481, 2012 U.S. Dist. LEXIS 203163 (N.D. Ill. Sep. 11, 2012)..........................6

*Warrick v. Roberts*,
　34 F. Supp. 3d 913 (N.D. Ill. 2014) .......................................................... 8-9, 10, 11

**Statutes**

735 ILCS 5/13-205 .............................................................................................13

735 ILCS 5/13-206 .............................................................................................11

815 ILCS 505/10a(e).............................................................................................13

17 U.S.C. § 106 .................................................................................................11

17 U.S.C. § 114(f)-(g).........................................................................................11

17 U.S.C. § 507(b)..............................................................................................13

**Rules and Regulations**

Fed. R. Civ. P. 12(d) ...........................................................................................2

37 C.F.R. § 380.4 ..............................................................................................11

Defendant SoundExchange, Inc. ("SoundExchange") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the First Amended Complaint ("FAC," Dkt. 36) of Plaintiff Kenneth Wright ("Plaintiff").

## I. **PRELIMINARY STATEMENT**

Pro se plaintiff Kenneth Wright's FAC cures none of the Complaint's dispositive defects, adds no relevant factual allegations to support the underlying claims, and attempts to include a new cause of action that is not legally cognizable. Plaintiff asserts claims against seventeen defendants, including moving defendant SoundExchange, relating to a recording entitled "All Dis Muzic," which he purportedly made more than thirty-five years ago. Plaintiff's nine claims can be divided roughly into two groups, copyright infringement (Counts I-III) and state law claims sounding in breach of contract and related claims for equitable relief (Counts IV-IX).

Defendant SoundExchange is a nonprofit collective rights management organization, which has been designated by the U.S. Congress to collect and distribute digital performance royalties for sound recordings. SoundExchange pays featured and non-featured artists and sound recording rights owners for non-interactive use under the statutory licenses set forth in 17 U.S.C. §§ 112 and 114. Other than identifying SoundExchange as a defendant (FAC ¶ 17), Plaintiff has not asserted any claims against, or allegations concerning, SoundExchange in any manner. Even given a certain leeway to pro se litigants, such laxity cannot permit Plaintiff to haul innocent parties into court without any basis. To the extent Plaintiff has any claims, they are limited to contractual claims against defendants D.J. International Records ("DJ") and Pop Star Music Publishing ("Pop Star"), and even then, would be subject to the Illinois statute of limitations of ten years.

All of Plaintiff's claims are based upon the false premise that Plaintiff is the owner of the copyrights in "All Dis Muzic" and that the defendants, in one capacity or another, have exploited

the recording without his consent. In truth, as confirmed in the FAC by Plaintiff himself, Plaintiff entered into agreements with DJ and Pop Star, assigning all of his rights to those defendants. The existence of these agreements prove fatal to Plaintiff's claims seeking damages for copyright infringement. Moreover, the false premise that none of the defendants had any rights to this recording infuses Plaintiff's remaining claims, rendering them similarly untenable. As such, all of Plaintiff's claims against SoundExchange should be dismissed with prejudice.

## II.  BACKGROUND[1]

Plaintiff Kenneth Wright purports to own the copyrights in "the distinctive 'sound recording' song" titled "All Dis Muzic," created in the 1980s. (FAC ¶ 25.) On or about October 6, 1986, Plaintiff and defendant DJ entered into an exclusive Contract for Recording Artists (the "Recording Agreement," Declaration of Laura K. McNally, dated April 4, 2022 ("McNally Decl."), Ex. 1), pursuant to which DJ "employ[ed]" Plaintiff "to render personal services for [DJ] or in [its] behalf for the purpose of recording and making phonograph records." (Ex. 1 ¶ 1.) Under the Recording Agreement, Plaintiff expressly agreed that "[a]ll recordings hereunder and all records and production made therefrom, together with sound recording copyrights therein and the performances embodied therein, shall be entirely [DJ's] property, free of any claims whatsoever by [Plaintiff] or any person deriving any rights or interests from [Plaintiff]." (*Id.* at ¶ 8.) The

---

[1] The facts below are taken from the FAC, and two agreements central to its allegations and implicitly referenced therein. (*See, e.g.,* FAC ¶ 36 ("The fact that this single was never released in North America, for the DJ International™ label it was produced under...."); *id.* at ¶ 40 ("When the song "*All Dis Music*" was taken overseas in 1987 by DJ International, Mr. Wright had only done what is known as a 'test pressing' but had departed from Chicago with a verbal understanding that...(the label owners of DJ International) would contact him....").) The Court may consider those agreements in deciding the instant motion. *See Bell v. Chi. Cubs Baseball Club, LLC*, No. 19-cv-2386, 2020 U.S. Dist. LEXIS 17527, at *8 (N.D. Ill. Feb. 4, 2020). In the event the Court determines that it may not consider the documents submitted with this motion to dismiss, the Court may convert this motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

Recording Agreement further provided that all of Plaintiff's performances were "made for hire" within the scope of his employment, and that DJ is "to be considered the author for the purpose of copyrights in sound recordings and . . . own[s] all of the rights comprised in such copyrights." (*Id.*) In addition, Plaintiff granted DJ and its licensees "the right to make records or other reproductions of the performances embodied in [Plaintiff's] recordings by any method now or hereafter known, and to sell and deal in the same . . . ." (*Id.*)[2]

Plaintiff signed and initialed each page of the Recording Agreement, which lists his full name, address, phone numbers, and (redacted) social security number on the first page. (*See generally id.*) Eight days *after* Plaintiff assigned DJ all rights in his musical recordings, the U.S. Copyright Office issued a copyright registration, of which the Court may take judicial notice,[3] for "1 sound cassette + lyrics" entitled "All Dis Muzic." (FAC ¶ 25; McNally Decl., Ex. 3.)

On or about February 4, 1987, Plaintiff and defendant Pop Star entered into an Exclusive Songwriter's Agreement (the "Publishing Agreement," and together with the Recording Agreement, the "Agreements," McNally Decl., Ex. 2), pursuant to which Pop Star "employ[ed]" Plaintiff "to render his services as a songwriter and composer . . . ." (Ex. 2 ¶ 1.) Under the Publishing Agreement, Plaintiff expressly agreed to:

> "irrevocably and absolutely assign[], transfer[], set[] over and grant[] to [Pop Star], its successors and assigns . . . all rights and interests of every kind, nature and description in and to the results and proceeds of [Plaintiff's] services hereunder . . . which musical works *have been* written, composed, created, or conceived, in whole or in part, by [Plaintiff] . . . and which may hereafter during the term hereof, be written, composed, created or conceived by [Plaintiff] . . . and which *are now owned* or controlled and which may, during the term hereof, be owned or controlled, directly or indirectly, by [Plaintiff] . . . including the title, words and music of each composition, and all world-wide copyrights . . . .

---

[2] In exchange for these rights and assignments, DJ agreed to pay Plaintiff certain advances and royalties on the sales of Plaintiff's recordings. (*See id.* at ¶¶ 3-6.)

[3] *See Blue Book Servs. v. Farm Journal, Inc.*, 435 F. Supp. 3d 912, 916 (N.D. Ill. 2020).

(*Id.* at ¶ 3) (emphasis added.)  Plaintiff further agreed and represented that all such rights, including copyrights, "are and shall at all times be [Pop Star's] sole and exclusive property as the sole owner thereof[.]"  (*Id.*)  In addition, the Publishing Agreement provided that the grant of rights thereunder specifically included exploitation of Plaintiff's compositions by, among other things, public performance, the sale of sheet music, and synchronization with "master records, transcriptions, sound tracks, pressings, and any other mechanical, electrical or other reproductions of said compositions…."  (*Id.* at ¶ 3(a)-(f).)[4]  Like the Recording Agreement, Plaintiff signed the Publishing Agreement and initialed each page of the Publishing Agreement.  (*See generally id.*)

Plaintiff filed this lawsuit on September 24, 2021, asserting eight causes of action against more than a dozen different music industry defendants and seeking more than $975 million in damages and equitable relief.  (*See generally* Cmplt, Dkt. 1.)  On January 28, 2022, defendant SoundExchange moved to dismiss the Complaint for legal and factual insufficiency and failure to state a claim.  (Dkt. 19.)  Plaintiff subsequently filed the FAC on March 21, 2022, in lieu of responding to SoundExchange's motion to dismiss.  Plaintiff alleges that DJ "illegally conveyed authority over the sale, manufacture and distribution of a 'test pressing' for 'All Dis Music' without sharing any knowledge of this" with Plaintiff, and engaged in the "blatant and pervasive spread of his music without any regard to his ownership in copyright."  (FAC ¶¶ 25, 39.)  Plaintiff further alleges that DJ and Pop Star "accepted royalty payments, unbeknownst to Mr. Wright, of proceeds acquired from the profits derived from the song … ."  (*Id.* at ¶ 31.)  Plaintiff's FAC contains no specific allegations of wrongdoing (or indeed, mention of any conduct whatsoever) by SoundExchange or any of the defendants other than DJ and Pop Star.

---

[4] In exchange for these rights and assignments, Pop Star agreed to pay Plaintiff certain advances and royalties on the exploitation of Plaintiff's compositions.  (*See id.* at ¶¶ 7-8.)

Plaintiff admittedly became aware of the allegedly unlawful exploitation "in 2003 when, a colleague discovered it online." (*Id.* at ¶ 96.)  Plaintiff began making inquiries regarding this matter to the defendants no later than August 31, 2005.  (*See id.* at ¶¶ 105-06.)

## III.  LEGAL STANDARD

"A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint," and to survive such a motion to dismiss, "a plaintiff's complaint must allege facts which, when taken as true, 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'"  *Bell v. Chi. Cubs Baseball Club, LLC*, No. 19-cv-2386, 2020 U.S. Dist. LEXIS 17527, at *7-8 (N.D. Ill. Feb. 4, 2020) (quoting *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016)).  To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do…"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In evaluating the legal sufficiency of a complaint, "it is proper for the Court to 'consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice.'"  *Chi. Cubs Baseball Club*, 2020 U.S. Dist. LEXIS 17527, at *8.

## IV.  ARGUMENT

### A.  THE FAC FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

#### 1.  Plaintiff's State Law Claims Fail Because Plaintiff Has Not Alleged Any Wrongful Conduct by SoundExchange.

Plaintiff has not alleged sufficient facts to plausibly suggest or allow the court to draw the reasonable inference that SoundExchange is liable under any of Plaintiff's state-law theories.

Plaintiff asserts causes of action for breach of contract and breach of warranty against all defendants, yet does not allege any act or omission by SoundExchange that could constitute a breach of any agreement with SoundExchange. The elements of a breach of contract claim are that "(1) there was a valid and enforceable contract between the parties, (2) the plaintiff performed the contract, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result." *Direct Energy Bus., LLC v. City of Harvey*, No. 1-20-0629, 2021 Ill. App. LEXIS 247, at *7 (Ill. App. 1st May 18, 2021). Plaintiff's failure as to nearly all of the essential elements of the claim warrants dismissal. *See Vermette v. Cozad Asset Mgmt.*, No. 4-19-0354, 2020 Ill. App. Unpub. LEXIS 475, at *34-35 (Ill. App. 4th Mar. 19, 2020) (affirming dismissal for failure to allege breach and noting that "it is not the job of this court to prop up deficient pleadings by reading in allegations of breach that do not exist"); *W. Consol. Premium Props. v. Mc Risk Servs. LLC.*, No. 12 C 3481, 2012 U.S. Dist. LEXIS 203163, at *9 (N.D. Ill. Sep. 11, 2012) (dismissing breach of contract claims against defendants not alleged to have entered contract with plaintiffs).

Plaintiff's unjust enrichment claim fares no better. "To state a cause of action upon a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Hatcher v. Hatcher*, 158 N.E.3d 326, 330 (Ill. App. 3d 2020); *Saletech, LLC v. E. Balt, Inc.*, 20 N.E.3d 796, 808 (Ill. App. 1st 2014). "If an unjust enrichment claim rests on the same improper conduct alleged in another claim, the unjust enrichment claim 'will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim.'" *Brinley Holdings, Inc. v. Husch Blackwell LLP*, No. 19-cv-05242, 2022 U.S. Dist. LEXIS 3462, at *17 (N.D. Ill. Jan. 7, 2022) (quoting *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011)).

The only relevant conduct alleged in the FAC is the "unauthorized" exploitation of the sound recording for "All Dis Muzic." Plaintiff's unjust enrichment claim is therefore inextricably tied to his copyright infringement claims, yet, as explained further below, Plaintiff cannot establish his ownership of any rights in the song. Plaintiff granted and/or assigned the copyrights to DJ and Pop Star pursuant to the Agreements. Without ownership of the copyrights, Plaintiff cannot plead that any of the defendants retained a benefit, *to his detriment*, from their exploitation. *See Saletech, LLC*, 20 N.E.3d at 808 (claim for unjust enrichment fails where defendants not alleged to have obtained benefit); *see also Brinley Holdings*, 2022 U.S. Dist. LEXIS 3462, at *17-18 ("Unjust enrichment is not a mode of imposing punitive damages; it is a means of recovering something that the defendant is not entitled to but is unfairly possessing *to the plaintiff's detriment*.") (emphasis in original). Good conscience requires nothing from SoundExchange as far as Plaintiff is concerned, and, as a result, the cause of action for unjust enrichment should be dismissed.

Plaintiff's constructive trust cause of action also fails to state a claim. Constructive trust is an equitable remedy imposed only "against one who, by some form of wrongdoing such as actual or constructive fraud, breach of a fiduciary duty, duress, coercion or mistake, has been unjustly enriched." *Gardner v. Cole*, No. 4-13-0002, 2013 Ill. App. Unpub. LEXIS 2389, at *14 (Ill. App. 4th Oct. 24, 2013); *Kaiser v. Fleming*, 735 N.E.2d 144, 148 (Ill. App. 2d 2000); *see Estate of Brown v. ARC Music Grp., Inc.*, 830 F. Supp. 2d 501, 509 (N.D. Ill. 2011) (constructive trust claim fails for inadequate pleading of fraud or the existence of a fiduciary relationship), *aff'd*, 523 F. App'x 407 (7th Cir. 2013). The Seventh Circuit has noted that "a breach of contract 'is not analogous to the wrongful activity that has been found to warrant the imposition of a constructive trust.'" *Estate of Brown*, 830 F. Supp. 2d at 509 (quoting *Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990)).

Plaintiff has alleged no wrongdoing by SoundExchange, and nothing sounding in fraud or breach of fiduciary duty against any of the defendants. Thus, this claim too is untenable. *See Kaiser v. Fleming*, 735 N.E.2d at 148-49 (affirming dismissal of constructive trust claim because "the plaintiff failed to sufficiently allege a fiduciary relationship"); *Estate of Brown*, 830 F. Supp. 2d at 509 ("Where the Estate has made no specific allegations of wrongdoing against Music Sales other than a failure to pay royalties due under a contract, this claim must be dismissed.").

The absence of any allegation in the FAC implicating conduct on the part of SoundExchange also proves fatal to Plaintiff's Illinois Consumer Fraud Act ("CFA") claim. A plaintiff bringing a CFA claim "must state with particularity and specificity the deceptive manner of defendant's acts or practices, and the failure to make such averments requires the dismissal of the complaint." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002); *see Ambrosius v. Chi. Ath. Clubs, LLC*, No. 1-20-0893, 2021 Ill. App. LEXIS 554, at *15 (Ill. App. 1st Sept. 30, 2021) ("A statutory consumer fraud claim must be pled with the same particularity and specificity as that required under common law fraud."). Plaintiff makes no such averments, mandating dismissal. Finally, Plaintiff's new cause of action in the FAC for "false unsubstantiated allegations," which appears to merely respond to SoundExchange's motion to dismiss the original Complaint, is not legally cognizable and fails to state a claim upon which relief can be granted.

### 2. Plaintiff's Copyright Claims Fail Because Plaintiff Cannot Establish Ownership of a Valid Copyright.

A copyright infringement claim has "two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Chi. Cubs Baseball Club*, 2020 U.S. Dist. LEXIS 17527, at *8 (quoting *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017)). "'[I]t is elementary that the lawful owner of a copyright is

incapable of infringing a copyright interest that is owned by [it].'" *Warrick v. Roberts*, 34 F. Supp. 3d 913, 919 (N.D. Ill. 2014) (quoting *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984)).

Counts I-III of Plaintiff's FAC, which all sound in copyright infringement, fail because Plaintiff cannot establish the first element of any copyright claim—his ownership of a valid copyright. Plaintiff granted and/or assigned all rights in "All Dis Muzic" (among other works), including the copyrights, when he entered into the Recording Agreement and Publishing Agreement with DJ and Pop Star, respectively. (*See* McNally Decl., Ex. 1 ¶ 8; Ex. 2 ¶ 3.) Any and all exploitation of "All Dis Muzic" by DJ and Pop Star, as well as by any of their successors, assignees, and licensees, was authorized and done pursuant to DJ's and Pop Star's ownership of the underlying copyrights, free from any adverse claim by Plaintiff. Plaintiff cannot establish his ownership of a valid copyright in "All Dis Muzic," and thus these causes of action should be dismissed with prejudice.

The essential facts here are similar to those in *Warrick v. Roberts*, where the court granted a motion to dismiss copyright infringement and related state law claims. *See* 34 F. Supp. 3d at 914-15. The plaintiffs were a songwriting duo that created the gospel musical composition, "I'm So Grateful (Keep in Touch)," a recording of which was sampled in the 2012 song "3 Kings," distributed by UMG Recordings, Inc. ("Universal") and featuring performances by hip-hop artists Rick Ross, Dr. Dre and Jay-Z. *Id.* at 915. The plaintiffs, apparently upset that elements of their gospel work were used as background music for "unsavory" rap lyrics, sued for copyright infringement. *Id.* at 915-16. The defendants claimed Universal held the sole copyright in the work and had licensed their activities, identifying a 1974 Exclusive Songwriter's and Composer's Agreement between one of the plaintiffs and ABC/Dunhill Music, Inc., Universal's predecessor-in-interest. *Id.* at 916. The court quoted provisions from that agreement remarkably similar to the

grant of rights contained in the Publishing Agreement. *Compare id.* at 916-17 (quoting sweeping release of all rights, including copyrights, worldwide), *with* McNally Decl., Ex. 2 ¶ 3 (same).

The court found "ultimately dispositive" the "inescapable" fact that one plaintiff had transferred her rights to ABC Dunhill, Universal's predecessor, making Universal, at a minimum, a co-owner of the copyright in "Grateful." *Id.* at 914, 919. The court reasoned that the 1974 publishing agreement "could not be more clear: Shepherd was selling in its totality her interest in the musical works," and "any ordinary reader of the English language would be on notice that the rights granted to ABC/Dunhill were extremely broad." *Id.* at 921. "Because Universal acted in accordance with the rights that Shepherd ceded to it in the 1974 Agreement," the court concluded, "it cannot be held liable for infringement . . . [and] neither Dr. Dre, Jay Z, Rick Ross nor any of the other defendants can be held liable for infringement, for they produced and performed 3 Kings in accordance with licenses validly given by Universal." *Id.* at 922; *see also Stavrinides v. Vin De Bona*, No. 2:18-cv-00314-CAS(JPRx), 2018 U.S. Dist. LEXIS 41305, at *9 (C.D. Cal. Mar. 12, 2018) (granting motion to dismiss copyright claim pursuant to agreement "irrevocably grant[ing]" the defendants the right "to freely use and exploit the [plaintiffs'] videos in any manner").

Plaintiff places inordinate and unjustifiable reliance upon his copyright registration. However, he ignores the fact that, irrespective of his purported authorship and filing of a registration application, he subsequently transferred all of his rights, including the copyrights in both the sound recording and the underlying musical composition for "All Dis Muzic," to DJ and Pop Star, respectively. The registration is not imbued with special powers permitting Plaintiff to ignore his own valid transfer of rights. A copyright registration creates a rebuttable presumption of authorship and ownership, but that presumption may be rebutted by agreements, such as those

here, that transfer ownership to third parties. *See Kast v. Chrysler Corp.*, No. 96 C 6657, 1997 U.S. Dist. LEXIS 7769, at *9 (N.D. Ill. May 27, 1997).

In the present case, the Agreements "could not be more clear" and it is likewise "elementary" that DJ and Pop Star could not infringe the copyright interests owned by them, nor could any of their successors, assignors, or licensees. *See Warrick*, 34 F. Supp. 3d at 919-21. Moreover, SoundExchange's role is defined and subscribed by the Copyright Act to simply collect and disburse royalties. *See* 17 U.S.C. § 114(f)-(g); 37 C.F.R. § 380.4. Thus, Plaintiff has not (and cannot) allege that SoundExchange acted or authorized anyone else to act in violation of the exclusive rights held by a copyright owner pursuant to the Copyright Act. *See* 17 U.S.C. § 106; *Scholz Design, Inc. v. Jaffe*, 488 F. Supp. 2d 749, 749 (N.D. Ill. 2007) (no direct infringement liability where defendants did not violate any Section 106 exclusive rights). Counts I-III of the Complaint must be dismissed.

**B.     THE FAC IS BARRED BY THE APPLICABLE STATUTES OF LIMITATION.**

All of Plaintiff's claims should also be dismissed because each is time-barred by the applicable statute of limitations. First, in Illinois, there is a ten-year limitations period for breach of written contract claims. *See Armstrong v. Guigler*, 673 N.E.2d 290, 293 (Ill. 1996); 735 ILCS 5/13-206 ("[A]ctions on bonds, promissory notes, bills of exchange, written leases, written contracts, or other evidences of indebtedness in writing . . . shall be commenced within 10 years next after the cause of action accrued[.]"). "An action for breach of contract accrues when the breach of the contractual duty or obligation occurs[.]" *Hassebrock v. Ceja Corp.*, 29 N.E.3d 412, 422 (Ill. App. 5th 2015) (internal citations, alterations, and quotation marks omitted); *see Hoover v. Country Mut. Ins. Co.*, 975 N.E.2d 638, 649 (Ill. App. 3d 2012) ("[F]or contract actions and torts arising out of contractual relationships, the cause of action accrues at the time of the breach of the contract, not when a party sustains damages."); *Estate of Brown*, 830 F. Supp. 2d at 511.

11

The only contracts referred to in the FAC are the 1986 Recording Agreement and the 1987 Publishing Agreement.  Plaintiff acknowledges and expressly alleges that any alleged breach of those Agreements occurred more than three decades ago.  (*See* FAC ¶ 28 ("[S]omeone else has been depositing the 50% split of publishing income from the song 'All Dis Music' from the date of its inception [1987 to 2021]."); *id.* at ¶ 70 ("Since in or about 1986, Defendants, individually and/or collectively and/or its successors in interest and/or persons or entities acting through them or under their authority . . . have continued to exploit the Compositions and Recordings entitled 'All Dis Music'....").)  Any conceivable contract claim that Plaintiff could assert against DJ or Pop Star would have accrued when those defendants first failed to pay Plaintiff under the Agreements, and would have been rendered untimely under the ten-year statute of limitations sometime in the late 1990s—decades before Plaintiff initially filed this lawsuit in 2021.

Accordingly, the statute of limitations bars Plaintiff's causes of action sounding in breach of contract.  *See Travelers Cas. & Sur. Co. v. Bowman*, 893 N.E.2d 583, 593 (Ill. 2008) (cause of action to enforce indemnity agreement untimely if commenced more than ten years after defendants failed or refused to tender payment); *Chi. Title Land Tr. Co. v. Potash Corp. of Sask. Sales Ltd.*, No. 1-12-3550, 2013 Ill. App. Unpub. LEXIS 1662, at *8-9 (Ill. App. 1st Jul. 31, 2013) (holding that "the cause of action for breach of contract accrued when PCS Sales (Canada) cancelled the lease without paying the plaintiffs the cancellation fee," and affirming dismissal on statute of limitations grounds); *see also Martin Cartage & Express, Inc. v. Arthur J. Gallagher & Co.*, No. 2-11-1271, 2012 Ill. App. Unpub. LEXIS 1671, at *18 (Ill. App. 2d Jul. 10, 2012) ("Hoping a party will remedy a breach does not delay accrual of the breach of contract action.").

Second, the statute of limitations for both unjust enrichment and constructive trust claims under Illinois law is five years and begins to run once "the plaintiff knew, or reasonably should

have known, that he has been injured and that his injury was wrongfully caused." *Rush Univ. Med. Ctr. v. Draeger, Inc.*, No. 17 C 6043, 2017 U.S. Dist. LEXIS 189588, at *5 (N.D. Ill. Nov. 16, 2017) (internal citation omitted); *see Sundance Homes v. Cty. of Du Page*, 746 N.E.2d 254, 263 (Ill. 2001) (noting that Illinois courts apply five-year statute of limitation to both claims); *Held v. Held*, 137 F.3d 998, 1002 (7th Cir. 1998) (applying five-year statute of limitations in 735 ILCS 5/13-205 to action for enforcement of a constructive trust). The discovery rule disposes of these causes of action in Plaintiff's FAC (Counts VI-VII).

Plaintiff admittedly became aware of the allegedly unlawful exploitation underlying the FAC as early as 2003, and began making inquiries regarding this matter to some defendants, reflecting his discovery and awareness, no later than August 2005. (*See* FAC ¶¶ 96, 105-06.) Plaintiff filed this action in September 2021, more than sixteen years later and at least thirteen years after the statute of limitations for unjust enrichment and constructive trust expired by August 2008. Therefore, these claims are untimely and should be dismissed. *See Estate of Brown*, 830 F. Supp. 2d at 511 (dismissing unjust enrichment, constructive trust, and other claims as time-barred).

Third, the CFA imposes a three-year statute of limitations, likewise from the date "when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Mosier v. Vill. of Holiday Hills*, 128 N.E.3d 1210, 1218 (Ill. App. 2d 2019); *see* 815 ILCS 505/10a(e). Plaintiff's statutory fraud claim (Count VIII) also expired no later than August 2008, pursuant to Plaintiff's alleged discovery of wrongful exploitation and missing payments by at least August 2005. *See Mosier*, 128 N.E.3d at 1218 (affirming dismissal with prejudice where plaintiffs filed suit more than three years after learning of the alleged injury).

Fourth, the Copyright Act provides a three-year statute of limitations for civil infringement claims. *See* 17 U.S.C. § 507(b). "The Seventh Circuit has adopted 'a discovery rule in copyright

cases: [t]he copyright statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights.'" *Energy Intelligence Grp. v. Exelon Generation Co.*, No. 20-cv-3983, 2021 U.S. Dist. LEXIS 76688, at *14 (N.D. Ill. Apr. 21, 2021) (quoting *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014)) (internal alteration and quotation marks omitted).  Although "any infringing act within [a] three-year look-back period . . . can form the basis of an infringement claim," this rule only "applies to ordinary infringement suits, not suits in which the central dispute is copyright ownership." *Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 819 F.3d 992, 996 (7th Cir. 2016).  "[C]opyright claims premised on disputes about ownership accrue 'when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation.'" *Id.* (quoting *Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013)) (internal quotation marks omitted).

Here, Plaintiff's copyright infringement claims (Counts I-III) are premised on a dispute of ownership and accrued upon the first express repudiation of his ownership in the copyright for "All Dis Muzic," which Plaintiff himself alleges occurred in or around 1987, and in no event later than August 2005.  Accordingly, these causes of action expired over a decade or more before Plaintiff initiated this action and should be dismissed pursuant to the Copyright Act's three year statute of limitations.  *See Consumer Health*, 819 F.3d 992 at 997.

## C.    FURTHER AMENDMENT WOULD BE FUTILE AND THE FAC SHOULD BE DISMISSED WITH PREJUDICE.

It is established within the Seventh Circuit that a court may dismiss a complaint with prejudice "if it is clear that any amendment would be futile." *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013); *see Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 693 (7th Cir. 2017) (affirming dismissal with prejudice and noting that district courts "have

broad discretion to deny leave to amend where there is . . . repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile.") (internal citation omitted); *Smith v. Convergent Outsourcing, Inc.*, 539 F. Supp. 3d 929, 935 (N.D. Ill. 2021). The circumstances here are analogous to those in *Hughes v. Southwest Airlines Co.*, where the court dismissed an amended complaint with prejudice, concluding that because the plaintiff had "again failed to sufficiently allege the elements of a breach of contract claim, and the Contract expressly precludes [plaintiff's] claim, an additional opportunity to amend would be futile … ." 409 F. Supp. 3d 653, 659 (N.D. Ill. 2019), *aff'd*, 961 F.3d 986 (7th Cir. 2020).

Plaintiff has already taken one opportunity to amend and filed the FAC, but not only has he failed to cure the Complaint's dispositive defects, it is clear that no set of facts exists under which Plaintiff can establish his ownership of the copyrights at issue, any wrongful conduct on the part of defendant SoundExchange, or that his claims are not fully time-barred. Even the leeway generally afforded to pro se litigants does not countenance continued litigation of the FAC's frivolous claims, which therefore should be dismissed with prejudice. *See Hart v. Amazon.com, Inc.*, 191 F. Supp. 3d 809, 826 (N.D. Ill. 2016) ("The Court has expressed sympathy for Plaintiff's frustrations with Amazon in its previous order[;] . . . however, Plaintiff does not allege any factual content that would support a cognizable claim under the law. Thus, the Court concludes that any amendment would be futile and the dismissed amended complaint is with prejudice."), *aff'd*, 845 F.3d 802 (7th Cir. 2017).

## V. <u>CONCLUSION</u>

For all of the above reasons, defendant SoundExchange, Inc. respectfully asks that the Court grant its motion to dismiss Plaintiff's FAC with prejudice, and award such other relief that the Court deems just and proper.

Dated: Chicago, Illinois
      April 4, 2022

                        Respectfully submitted,

                        **LOEB & LOEB LLP**

                        By: <u>/s/ *Laura K. McNally*</u>
                              Laura K. McNally
                              321 North Clark Street, Suite 2300
                              Chicago, IL 60654
                              Telephone: (312) 464-3155
                              Email: lmcnally@loeb.com

                        *Attorneys for Defendant SoundExchange, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH WRIGHT, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | Case No.: 1:21-cv-5085 |
| v. | ) | |
| | ) | Judge Franklin U. Valderrama |
| DJ INTERNATIONAL RECORDS, ASCAP, | ) | |
| POP STAR PUBLISHING, LONDON | ) | Magistrate Judge Sheila M. |
| RECORDS/FFRR, BOLLORÉ SE, | ) | Finnegan |
| VIVENDI SE, THE SEAGRAM | ) | |
| COMPANY LTD., WARNER BROS., | ) | |
| HARMLESS RECORDS, POLYDOR | ) | |
| JAPAN, VIRGIN EMI, DEMON MUSIC, | ) | |
| PEERMUSIC, SOUNDEXCHANGE, | ) | |
| SPOTIFY, BMI AND UNIVERSAL | ) | |
| MUSIC GROUP, AND JOHN DOES 1-10, | ) | |
| | ) | |
|    Defendants. | ) | |
| | ) | |

## DECLARATION OF LAURA K. MCNALLY

I, LAURA K. MCNALLY, hereby declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746.

1.    I am a partner with Loeb & Loeb LLP, attorneys for Defendant SoundExchange, Inc. ("SoundExchange")  I am admitted to practice in the State of Illinois and in the U.S. District Court for the Northern District of Illinois.

2.    I am fully familiar with the facts set forth herein, and respectfully submit this Declaration in Support of SoundExchange's Motion to Dismiss the Amended Complaint of Plaintiff Kenneth Wright ("Plaintiff").

3.    **Exhibit 1** hereto is a true and correct copy of a Contract for Recording Artists, dated October 6, 1986, between Plaintiff and Defendant DJ International Records.

4.     **Exhibit 2** hereto is a true and correct copy of an Exclusive Songwriter's Agreement, dated February 4, 1987, between Plaintiff and Defendant Pop Star Publishing.

5.     **Exhibit 3** hereto is a true and correct copy of the U.S. Copyright Office Official Public Catalog record for "All Dis Muzic," Registration No. SRu000100565.

Dated:  Chicago, Illinois
        April 4, 2022

                                        */s/ Laura K. McNally*
                                        LAURA K. MCNALLY

# EXHIBIT 1



# D.J. INTERNATIONAL RECORDS

### 727-C W. RANDOLPH ST. CHICAGO,IL. 60606    312/559-1845

CONTRACT FOR RECORDING ARTISTS *P.K.A. "ROMANCE"*

D.J. INTERNATIONAL RECORDS          BETWEEN          *KENNETH ANTHONY WRIGHT*
1158 W. CHICAGO AVE.                                 *5828 W. WASHINGTON BLVD. APT 2E*
CHICAGO, IL  60622                  AND              *CHICAGO, IL. 60644.........*
                                                     *626-8291/383-6909/524-1266*
                                                     *AFTER 5p.m* REDACTED

Dear Artist:

1.   This contract for your personal services is made between Record Company as the employer and you.  We hereby employ you to render personal services for us or in our behalf for the purpose of recording and making phonograph records.

2.   Recordings will be made at times during the term hereof in studios as we may designate.  A minimum of 2 45 r.p.m. or 33-1/3 r.p.m. record sides, or their equivalent, per year shall be recorded during the initial period of this contract, and additional recordings shall be madeat our election.  The musical compositions to be recorded shall be designated by us, and each recording shall be subject to our approval as satisfactory for manufacture and sale.  We reserve the right, at our election, to suspend the operation of this contract if, by reason of sickness, injury, accident or refusal to work, you fail to perform hereunder in accordance with the provisions hereof, or if, due to any labor controversy or adjustment thereof or to any other cause not entirely with in our control or which we cannot by reasonable diligence have avoided, we are materially hampered in the recording, manufacture, distribution or sale of records, or our normal business operations become commercially impractical. Such suspension shall be upon written notice to you and shall last for the duration of any such contingency.  At our election, a period of time equal to the duration of such suspension shall be added at the end of the then current period of the term hereof, and such period and the term hereof shall be accordingly extended.

*K. W.*

3.   For the rights herein granted and for the services to be rendered hereunder by you, we shall pay you as to records sold in the United States of America:

   a.   a royalty of ............*TEN*...... ( ..*10*......% ) per cent in respect of compositions performed by you and recorded by us during the first term of this agreement.
   b.   a royalty of ...........*TWELVE*... ( ...*12*......% ) per cent in respect of compositions performed by you and recorded by us during the second term of this agreement, if renewed.
   c.   a royalty of ..........*FIFTEEN*... ( ...*15*......% ) per cent in respect of compositions performed by you and recorded by us during subsequent term of this agreement, if renewed.

and as to records sold in other countries a royalty at the rate of one-half the aforesaid royalities, for the respective terms, of the retail list price (less governmental taxes and duties) of records in the country of manufacture of 90% of all double-faced records manufactured, sold, paid for and not subject to return on both faces of which are embodied only the selections recorded hereunder; and one-half the respective amounts of such royalty for 90% of all records manufactured, sold, paid for and not subject to return on only one face of which are embodied only selections hereunder; provided, however, that for records sold in Europe we may, from time to time, at our election, base the percentages either upon the retail list prices in the country of manufacture, or the retail list prices in England.

   In the event that any of the performance hereunder are released together with or in combination with other performances or recordings in a long playing

# D.J. INTERNATIONAL RECORDS

## 727-C  W. RANDOLPH ST.  CHICAGO, IL. 60606  312/559-1845

r extended play record it is agreed that as to such record you shall receive that proportion of the royalities payable to you as provided hereinbefore as the number of selections included in such record which are performances recorded hereunder bears to the total number of selections embodied in such record.  Royalties for records sold outside of the United States of America are to be computed in the national currency of the country where the retail listprices above mentioned apply, and are to be payable only with respect to recordsfor which we receive payment in the United States of America, in dollar equivalent at the rate of exchange at the time we receive payment in the United States of America, and after proportionate deductions for income and remittance taxes withheld at the source.

As to records sold by direct mail operation or through record clubs or similar sales plans or devices and as to records for which there is a low pricedline, suggested retail list price, and as to sales of tape through licensees embodying performances hereunder, and as to sales by distribution through retailoutlets in conjunction with special advertisements on radio or television, the royalty rate shall be one-half that provided hereinbefore. Royalties on records sold for use as premium or promotional merchandise shall be at one-half the rateprovided hereinbefore and shall be based on the price (less governmental taxes and duties) received by us for such records.  No royalty shall be payable as to records distributed to members of and/or subscribers to said "record club" operation,
either as a result of joining or subscribing to such club, and/or as a result of the purchase of a required number of records, including but not limited to "bonus" and/or "free" records.

No royalties shall be payable in respect of records given away for promotional purposes or sold at below stated wholesale prices to disc jockeys, record reviewers, radio and television stations and networks, motion picture companies, music publishers, our employees, you or other customary recipients of promotional records or for use on transportation facilities, or records sold as scrap, salvage, overstock or "cut outs", or records sold below our cost of manufacturing.  If records are shipped subject to a special discount or merchandise plan, the number of such records deemed to have been sold shall be determined by reducing the number of records shipped by the percentage of such discount granted and if a discount is granted in the form of "free" or "bonus" records, such "free" or "bonus" records shall not be deemed included in the number of records sold.

Our customary charges for albums, jackets, boxes, or other packaging and container will be excluded from the royalty base for the purposes of this Paragraph 3.

4.  For your services rendered, and for the rights granted herein to us, we shall make a nonreturnable advance payment to you, within fourteen (14) days after the services are rendered at each recording session, at the rate of union scale, and each such payment shall constitute an advance and be charged against your royalities, if and when earned, under this or any other agreement between you and us.  Within fourteen (14) days after the services are rendered at each recording session we will pay for the services of the accompanying musicians, vocalists, arrangers and copyists at the rate of union scale, and such payments and other recording costs shall be charged against your royalties, if and when earned, under this or any other agreement between us.

5.  In the event you accompany other royalty artists, it is agreed that the amount of your royalty shall be proportionately reduced by the total number of royalty artists and the costs under Paragraph 4 to be charged against your royalties shall be proportionately reduced.

Case: 1:21-cv-05085 Document #: 37 Filed: 04/04/22 Page 27 of 42 PageID #:243

6.  Payment of accrued royalties shall be made semi-annually on the 1st day of May for the six months ending February 28th; and on the 1st day of November, for the six months ending August 31, in each year.  However, we shall have the right to deduct from the amount of royalties due any advance royalties previously paid.  All royalty statements, and all other accounts rendered by us to you, shall be binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basic thereof, is given to us within one (1) year from the date rendered.

7.  During the term of this contract you will not perform for the purpose of making phonograph records for any person other than us; and after the expiration of the term of this contract you will not perform any selections recorded hereunder for any other person for the purpose of making phonograph records,
within five (5) years after the expiration of this contract.  If during the term of this contract you perform any composition for the purpose of making any recording for any medium other than phonograph records you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used directly or indirectly for the purpose of making phonograph records or any other device for home use. You agree to supply us promptly with a signed copy or a photostat of a signed copy upon execution of such agreement. You acknowledge that your services are uniqueand extraordinary.

8.  All recordings hereunder and all records and production made therefrom, together with sound recording copyrights therein and the performances embodied therein, shall be entirely our property, free of any claims whatsoever by you or any person deriving any rights or interests from you.  You acknowledge that your performances in the sound recordings hereunder were made for hire within the scope of your employment and that we are to be considered the author for the purpose of copyrights in sound recordings and that we own all of the rights comprised in such copyrights, including any rights to renew and extend the copyrights.  Without limitation of the foregoing, we, and/or our subsidiaries, affiliates and licensees shall have the right to make records or other reproductions of the performances embodied in such recordings by any method now or hereafter known, and to sell and deal in the same under any trademark or trade-names or labels designated by us, or we may at our election refrain therefrom.

9.  We shall have the right to use and to allow others to use your name, signature and likeness, and biographical material concerning you, for advertising and purposes of trade, and otherwise without restriction, in connection with the services performed.  You agree that during the term of this agreement you will not permit or authorize anyone other than us to use your name, signature or likeness in conjunction with the making, advertising or marketing of phonograph records, except for phonograph records made by you prior to the term of this agreement under agreements with other recording companies.

10.  Notwithstanding any provision in this contract to the contrary, it is specifically understood and agreed by all parties hereto:
a.  They are bound by all the terms and provisions of the AFTRA CODE OFFAIR PRACTICE for Phonograph recordings:
b.  That should there be any inconsistency between the contract and said CODE OF FAIR PRACTICE, the said CODE OF FAIR PRACTICE shall prevail, but

Case: 1:81-cv-05599 Document #: 160-11 Filed: 02/11/22 Page 29 of 42 PageID #:244

nothing in this **provision shall affect terms**, compensation or conditions provided in this **contract which are more favorable to members of AFTRA** than the terms, compensation and conditions provided for in said CODE FAIR PRACTICE.

c.  **If the term of** this contract is of longer duration than the term of said Code, **then from and after** the expiration date of the Code: (a) the provisions of **this contract shall be deemed modified to confirm** to any agreement or **modification** negotiated or agreed to in a **renewal or extension of** the Code: and **(b) while no code is in effect the existence of this contract** shall **not prevent the artist** from engaging in any strike or work stoppage without penalty by way of damage or otherwise to you or AFTRA.  In the event **you engage in such** strike or stoppage we may suspend this contract for the **duration of the strike** or stoppage and may have the option of extending the **term of this** contract for a period of time equal to the length of such strike **or stoppage** which option must be exercised by written notice given to you **within thirty (30) days** after the end of the strike or stoppage.

d.  The artist represents that (s)he is or will become a member of the **American Federation of Television and Radio Artists in good standing.***

11.  You represent and warrent that you are under no disability, restrictions or prohibition, whether contractual or otherwise, with respect to your right to execute this contract and perform its terms and conditions, and with respect to your right to record any and all compositions hereunder.  You agree to and do hereby indemnify, save and hold us harmless from any and all loss and damage (including attourneys' fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties or representations made by you in this contract, and you agree to reimburse us, on demand, for any payment made by us at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies.

12.  All compositions written or composed by you and recorded hereunder shall be licensed to us, at our election, at a royalty rate of $ .025  per record side for records made and distributed.  Arranged versions of musical compositions in the public domain, when furnished by you for recordings hereunder, shall be free of copyright royalties.Any assignment made by you of the ownership or copyright in any such compositions or in any such arranged version of a musical composition in the public domain shall be made by you subject to the provisions hereof.

13.  For the purposes of this contract the terms "records" or "phonograph records" shall include all forms of recordings manufactured or sold primarily for use as home entertainment, including, without limitation, discs of any speed or size, magnetic recording tape and any other medium for reproduction of artistic performances primarily for home entertainment now known or which may hereafter become known, whether embodying sound alone or sound synchronized with or accompanied by visual images, e.g. "sight and sound" devices.

14.  This contract sets forth the entire agreement between us with respect to the subject matter hereof.  No modification, amendment, waiver, termination or discharge of this contract or any provision hereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company. No waiver of any provision of this contract or of any default hereunder shall affect our rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

15.  This agreement shall be deemed to have been made in the state of Illinois, and it's validity, construction and effect shall be governed by the

# D.J. INTERNATIONAL RECORDS

## 727-C  W. RANDOLPH ST.  CHICAGO, IL. 60606  312/559-1845

laws of the state of Illinois.

16.   The **period of** this contract shall be **two (2)** years commencing with the date hereof.

17. **You grant us 3 (three), successive options to extend the term of this agreement for periods of** one **(1)** year each upon all the **terms** and conditions herein contained.   Such extensions shall commence at the expiration of the term of **this agreement,** unless it shall have been extended, in which event it shall **commence** at the expiration date of any such extension.   Any option to extend **the term** of this agreement may be exercised by us by giving you notice, in **writing,** at least thirty (30) days prior to the expiration of the term of this **agreement** or any extension thereof.   Such notice to you may be given by delivery **to you** personally or by  mailing to you at your address last known to us.   Such notice by mail shall be deemed to have been given on the date on which it is **mailed** by registered mail.

18.   We may at our election assign this agreement or any of our rights hereunder.

Please sign and date **all** copies of this contract in the place provided and return same to the **undersigned.**   One executed copy of this letter will be returned to you **for your files.**

Very. Truly Yours,

D. J. International

By ........................................

Agreed To and Accepted: X.. _Kenneth A. Wright (Romance)_ .Date. 10/6/86.

# EXHIBIT 2

## EXCLUSIVE SONGWRITER'S AGREEMENT

THIS AGREEMENT made and entered into this 5th day of February ,1987 , by and between POP STAR (hereinafter referred to as "Publisher") and Ken Wright (hereinafter referred to as "Writer").

For and in consideration of the mutual covenants set forth, the parties do hereby agree as follows:

1. **Employment.** Publisher hereby employs Writer to render his services as a songwriter and composer and otherwise as may be hereinafter set forth. Writer hereby accepts such employment and agrees to render such services exclusively for Publisher during the term hereof upon the terms and conditions set forth herein.

2. **Term.** The term of this agreement shall commence with the date hereof and shall continue in force for a period of two (2) year from said date. Writer hereby grants to Publisher a series of ONE (1) separate, consecutive and irrevocable options to extend this agreement for periods of one *Two Yrs 3 mos* (2) year each beginning at the expiration of the original *K.W.* term. Each option may be exercised only by written notice to Writer given by Publisher at least fifteen (15) days prior to the expiration of the then current period. At Publisher's election, more than one option may be exercised at the same time.

3. **Grant of Rights.** Writer hereby irrevocably and absolutely assigns, transfers, sets over and grants to Publisher, its successors and assigns, each and every and all rights and interests of every kind, nature and description in and to the results and proceeds of Writer's services hereunder, including but not limited to the titles, words and music of any and all original musical compositions in the public domain in any and all forms, and/or all rights and interests existing under all agreements and licenses relating thereto, together with all world-wide copyrights and renewals and extensions thereof, which musical works have been written, composed, created, or conceived, in whole or in part, by Writer alone or in collaboration with another or others, and which may hereafter during the term hereof, be written, composed, created or conceived by Writer, in whole or in part, alone or in collaboration with another or others, and which are now owned or controlled and which may, during the term hereof, be owned or controlled, directly or indirectly, by Writer, alone or with others, or as the employer or transferee, directly or indirectly, of the writers or composers thereof, including the title, words and music of each composition, and all world-wide copyrights and renewals and extensions thereof, all of which Writer does hereby represent are and shall at all times be

Publisher's sole and exclusive property as the sole owner thereof, free from any adverse claims or rights therein by any other person, firm or corporation.

Writer acknowledges that, included within the rights and interests hereinabove referred to, but without limiting the generality of the foregoing, is Writer's irrevocable grant to Publisher, its successors, licensees, sublicensees and assigns, of the sole and exlusive right, license, privilege and authority throughout the entire world with respect to the said original arrangements of compositions in the public domain, whether now in existence or hereafter created during the term hereof, as follows:

(a) To perform said musical compositions publicly for profit by means of public and private performance, radio broadcasting, television, or any and all other means, whether now known or which may hereafter come into existence.

(b) To substitute a new title or titles for said compositions and to make any arrangement, adaptation, translation, dramatization and transposition of said compositions, in whole or in part, and in connection with any other musical, literary or dramatic material as Publisher may deem expedient or desirable.

(c) To secure copyright registration and protection of said compositions in Publisher's name or otherwise as Publisher may desire at Publisher's own cost and expense and ~~at Publisher's own cost and expense~~ at at Publisher's election, including any and all renewals and extensions of copyrights, and to have and to hold said copyrights, renewals, extensions and all rights of whatsoever nature thereunder existing, for and during the full term of all said copyrights and all renewals and extensions thereof.

(d) To make or cause to be made, master records, transcriptions, sound tracks, pressings, and any other mechanical electrical or other reproductions of said compositions, in whole or in part, in such form or manner and as frequently as Publisher's sole and uncontrolled discretion shall determine, including the right to synchronize the same with sound motion pictures and the right to manufacture, advertise, license or sell such reproductions for any and all purposes, including but not limited to private performances and public performances, by broadcasting, television, sound motion pictures, wired radio and any and all other means or devices whether now known or which may hereafter come into existence.

(e) To print, publish and sell sheet music, orchestrations, arrangements and other editions of the said compositions in all forms, including the right to include any or all of said compositions in song folios or lyric magazines with or without music, and the right to license others to include any or all of said compositions in song folios or lyric magazines with or

without music.

(f) Any and all other rights of every and any nature now or hereafter existing under and by virtue of any common law rights and any copyrights and renewals and extensions thereof in any and all of such compositions. Writer grants to Publisher, without compensation other than as specified herein, the perpetual right to use and publish and to permit others to use and publish Writer's name (including any professional name heretofore or hereafter adopted by Writer), likeness, voice and sound effects and biographical material, or any reproduction or simulation thereof and titles of all compositions hereunder in connection with the printing, sale, advertising, distribution and exploitation of music, folios, recordings, performances, player rolls and otherwise concerning any of the compositions hereunder, and for any other purpose related to the business of Publisher, its affiliated and related companies, or to refrain therefrom. This right shall be exclusive during the term hereof and nonexclusive thereafter. Writer will not authorize or permit the use of his name, likeness, biographical material concerning Writer, or other identification of Writer, or other identification of Writer, or any reproduction or simulation thereof, for or in connection with any musical composition or works, in any manner or for any purpose, other than by or for Publisher. Writer further grants to Publisher the right to refer to Writer as a "Publisher Exclusive Songwriter and Composer" or other similar appropriate appellation.

4. **Exclusivity.** From the date hereof and during the term of this agreement, Writer will not write or compose, or furnish or dispose of, any musical compositions, titles, lyrics or music, or any rights or interests therein whatsoever, not participate in any manner with regard to the same for any person, firm or corporation other than Publisher, nor permit the use of his name or likeness as the writer or co-writer of any musical composition by any person, firm or corporation other than Publisher.

5. **Warranties.** Writer hereby warrants and represents to Publisher: Writer has the full right, power and authority to enter into and perform this agreement and to grant to and vest in Publisher all the rights herein set forth, free and clear of any and all claims, rights and obligations whatsoever; all the results and proceeds of the services of Writer hereunder, including all of the titles, lyrics, music and musical compositions, and each and every part thereof, delivered and to be delivered by Writer hereunder are and shall be new and original and capable of copyright protection throughout the entire world, and that no part thereof shall be animitation or copy of, or shall infringe any other original material and that Writer has not and will not sell, assign, lease, license or in any other way dispose of or encumber the rights herein granted to Publisher.

6. Power of Attorney. Writer does hereby irrevocably constitute, authorize, empower and appoint Publisher, or any of

its officers, Writer's true and lawful attorney (with full power of substitution and delegation) in Writer's name, and in Writer's place and stead, or in Publisher's name, to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments or documents which Publisher, from time to time, may deem desirable or necessary to vest in Publisher, its successors, assigns and licensees, any of the rights or interests granted by Writer hereunder, including but not limited to such douments required to secure to Publisher the renewals and extensions of copyrights throughout the world of musical compositions written or composed by Writer and owned by Publisher, its successors and assigns, such renewal copyrights, and all rights therein for the terms of such renewals and extensions for the use and benefit of Publisher, its successors and assigns.

7. Compensation. Provided that Writer shall faithfully and completely perform the terms, covenants and conditions of this agreement, Publisher hereby agrees to pay Writer for all services to be rendered by Writer under this agreement and for the rights acquired and to be acquired hereunder, the following compensation based on the musical compositions which are the subject hereof:

(a) Five (5) cents per copy for each and every regular piano copy and for each and every dance orchestration sold by Publisher and paid for, after deduction of each and every return, in the United States.

(b) Ten percent (10%) of the retail selling price upon each and every printed copy of each and every other arrangement and edition thereof printed, published and sold by Publisher and paid for, after deduction of each and every return, in the United States, except that in the event that such compensation shall be used or caused to be used, in whole or in part, in conjunction with one or more other musical compositions in a folio or albuim, Writer shall be entitled to receive that proportion of said ten percent (10%) which the subject musical compositions shall bear to the total number of musical compositions contained in such folio or album.

(c) Fifty percent (50%) of any and all net sums actually received (less any costs for collection) by Publisher from mechanical rights, electrical transcription and reproducing rights, motion picture synchronization and television rights and all other rights (excepting public performing rights) therein, including the use thereof in song lyric folios, magazines or any other editions whatsoever sold by licensees ofd Publisher in the United States.

(d) Writer shall receive his public performance royalties throughout the world directly from his own affiliated performance rights society and shall have no claim whatsoever against the Publisher for any royalties received by Publisher from any performing rights society which makes payment directly (or

indirectly other than through Publisher) to writers, authors and composers.

(e) Fifty percent (50%) of any and all net sums, after deduction of foreign taxes, actually received (less any costs for collection) by Publisher from sales and uses directly related to subject musical compositions in countries outside of the United States (other than public performance royalties as hereinabove mentioned in paragraph 7(d)).

(f) Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies or mechanical derivatives which are distributed gratuitously to performing artists, orchestra leaders, disc jockeys ord others for advertising or exploitation purposes. Furthermore, no royalties shall be payable to Writer on consigned copies unless paid for, and not until such time as an accounting therefore can properly be made.

(g) Royalties as specified hereinabove shall be payable solely to Writer in instances where Writer is the sole author of the entire composition, including the words and music thereof. However, in the event that one or more other songwriters are authors along with Writer on any compositions, then the foregoing royalties shall be divided equally between Writer and the other songwriters of such composition unless another division of royalties is agreed upon in writing between the parties concerned.

(h) Except as herein expressly provided, no other royalties or moneys shall be paid to Writer.

(i) It is also distinctly understood that no royalties are payable on consigned copies unless paid for, and not until such time as an accounting therefor can properly be made.

8. **Advances.** Simultaneously herewith Publisher's affiliated Record Company, is paying to Writer, as a non-returnable advance against royalties under a recording contract of even dates between said parties, the sum of _Four Hundred_ ($ _400 00_). To the extent that said sum or any other charges or advances under said recording contract shall not be recouped by Record Company from royalties thereunder, same shall be recouped against royalties payable to Writer under this or any other agreement whether now in existence or hereafter entered into between Writer and Publisher.

9. **Accounting.** Publisher will compute the total composite royalties earned by Writer pursuant to this agreement, and pursuant to any other agreement between Writer and Publisher, whether now in existence or entered into at any time subsequent hereto, on or before March 31 for the semi-annual period ending and pursuant to any other agreement, previous, simultaneous or

subsequent hereto between Writer and Publisher, within sixty **(60)** days after the first day of January and the first day of July of each year for the preceding six (6) month period, and will remit to Writer the net amount of such royalties, if any, after deducting any and all recoupable advances and chargeable costs under this agreement or other agreement between Writer and Publisher, together with the detailed royalty statement, within such sixty (60) days. All royalty statements rendered by Publisher to Writer will be binding upon Writer and not subject to any objection by Writer for any reason unless specific objection is made, in writing, stating the basis thereof, to Publisher within one (1) year from the date rendered. Writer shall have the right, upon the giving of at least thirty (30) days written notice to Publisher, to inspect the books and records of Publisher, insofar as the same concerns Writer, at the expense of Writer, at reasonable times during normal business hours, for the purpose of verifying the accuracy of any royalty statement rendered to Writer hereunder.

10. Collaboration with other Writers. Whenver Writer shall collaborate with any other person in the creation of any musical composition, any such musical composition shall be subject to the terms and conditions of this agreement and Writer warrants and represents that prior to the collaboration with any other person, such other person shall be advised of exclusive agreement and that all such compositions must be published by Publisher. In the event of such collaboration with any other person, Writer shall notify Publisher of the extent of interest that such other person may have in any such musical composition and Writer shall cause such other person to execute a separate songwriter's agreement with respect thereto, which agreement shall set forth the division of songwriter's share of income between Writer and such other persons, and Writer will promptly execute such agreement. Publisher shall have the right, pursuant to the terms and conditions hereof, to execute such agreement in behalf of Writer hereunder. Such agreement shall supplement and not supercede this agreement. In the event of any conflict between the provisions of such agreement and this agreement, the provisions of this agreement shall govern. The failure of either of the parties hereto to execute such agreement, whether requested by Publisher or not, shall not affect the rights of each of the parties hereunder, including but not limited to the rights of Publisher to all of the musical compositions written and composed by Writer.



11. Writer's Services. Writer agrees to perform the services required hereunder conscientiously and solely and exclusively for and as requested by Publisher. Writer is deemed to be a "writer for hire" hereunder with full rights of copyright renewal vested in Publisher. Writer further agrees to promptly and faithfully comply with all requirements and requests made by Publisher in connection with its business as set forth herein. Writer will deliver a manuscript with each musical composition hereunder immediately upon completion or acquisition of such musical

compositions. Nothing contained in this agreement shall obligate Publisher to exploit in any manner any of the rights granted to Publisher hereunder. Publisher at its sole discretion shall reasonably make studio facilities available to Writer so that Writer, subject to the supervision and control of Publisher, may make demonstration records of the musical compositions hereunder, and also for Writer to perform at such recording session. Writer shall not incur any liability for which Publisher may be responsible in connection with any demonstration recording session without having first obtained Publisher's written approval as to the nature, extent and limit of such liability. In no event shall Writer incur any expense whatsoever in behalf of Publisher without first having received written authorization from Publisher. Writer shall not be entitled to any compensation (in addition to such compensation as may be otherwise provided for herein) with respect to services rendered in connection with such demonstration records recording sessions. Publisher shall advance the costs for the production of demonstration records, and one-half (1/2) such costs shall be deemed additional nonreturnable advances to Writer and shall be deducted from royalties payable to Writer by the Publisher under this or any other agreement between the parties. All recordings and reproductions made at demonstration recording sessions hereunder shall become the sole and exclusive property of the Publisher, free of any claims whatsoever by Writer or any person deriving any rights from Writer.

Writer will, from time to time, at Publisher's request, whenever the same will not unreasonably interfere with other professional engagements of Writer, appear ford photography, artwork and other similar reasons under the direction of Publisher or its duly authorized agent; appear for interviews with such representatives of newspapers, magazines and other publications; and confer and consult with Publisher regarding Writer's services hereunder and other matters which may concern the parties hereto. Writer will also cooperate with Publisher in promoting, publicizing and exploiting musical compositions written or composed by Writer hereunder, and for any other purpose related to the business of Publisher, its affiliated and related companies. Writer shall not be entitled to any compensation (other than as may be specified herein) for rendering such services.

12. Unique Services. Writer acknowledges that the services rendered hereunder are of a special, unique, unusual, exraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by Writer of any of the provisions of this agreement will cause Publisher great and irreparable injury and damage. Writer expressly agrees that Publisher shall be entitled to the remedies of injunction and other equitable relief to prevent a breach of this agreement or any provision hereof, which relief shall be in addition to any other remedies, for damages or otherwise, which

may be available to Publisher.

13. **Actions.** Publisher may take such action as it deems necessary either in Writer's name or in its own name, against any person to protect all rights and interests acquired by Publisher hereunder. Writer will at Publisher's request, cooperate fully with Publisher in any controversy which may arise or litigation which may be brought concerning Publisher's rights and interests hereunder. Publisher shall have the right, in its absolute discretion, to employ attorneys and to take any other proper steps to protect the right, title and interest of Publisher in and to each musical composition hereunder and every portion thereof and in that connection, to settle, compromise or in any other manner dispose of any matter, claim, action or proceeding and to satisfy any judgment that may be rendered, in any manner as Publisher in its sole discretion may determine. Any legal action brought by Publisher against any alleged infringer of any musical composition hereunder shall be initiated and prosecuted by Publisher, and if there is any recovery made by Publisher as a result thereof, after deduction of the expense of litigation, including but not limited to attorneys' fees and court costs, a sum equal to fifty percent (50%) of such net proceeds shall be paid to Writer. If a claim is presented against Publisher in respect of any musical composition hereunder, and because thereof Publisher is jeopardized, Publisher shall have the right thereafter, until said claim has been finally adjudicated or settled, to withold any and all royalties that may be or become due with respect to such disputed compositions pending the final adjudication or settlement of such claim. Publisher, in addition, may withhold other royalties to be earned pursuant to this agreement or any other agreement between Writer and Publisher, and its affiliated or related companies, sukfficient in the opinion of Publisher, to reimburse Publisher for any fees and costs resulting therefrom. Publisher shall advance the costs of litigation, if any, including court costs and attorneys' fees together with any damages which may be paid as a result of the settlement or adjudication of a claim in connection with a musical composition written or composed by Writer. All such costs and damages shall be deemed an advance against any royalties payable to Writer under this or any other agreement between Writer and Publisher. Upon the final adjudication or settlement of each and every claim hereunder, all moneys withheld shall then be disbursed in accordance with the rights of the parties as provided hereinabove.

14. **Notices.** Any written notice, statement, payment or matter required or desired to be given to Publisher or Writer pursuant to this agreement shall be given by addressing the same to the addresses of the respective parties referred to above, or to such other address as either party may hereafter designate, in writing, to the other party, and on the date when same shall be deposited, so addressed, postage prepaid, in the United States mail, or on the date when delivered, so addressed, toll prepaid, to a telegraph or cable company, or on the date when same shall

be delivered to the other party personally or to his duly authorized agent (as designated in writing), such notice shall be deemed to have been duly made pursuant hereto.

15. **Entire Agreement.** This agreement supersedes any and all prior negotiations, understandings and agreements between the parties hereto with respect to the subject matter hereof. Each of the parties acknowledges and agrees that neither party has made any representations or promises in connection with this agreement or the subject matter hereof not contained herein.

16. **Modification, Waiver, Illegality.** This agreement will not be cancelled, altered, modified, amended or waived, in whole or in part, in any way, except by an instrument in writing signed by both Publisher and Writer. The waiver by Publisher of any breach of this agreement in any one or more instances, shall in no way be construed as a waiver of any subsequent breach (whether or not of similar nature) of this agreement by Writer. If any part of this agreement shall be held to be void, invalid or unenforceable, it shall not affect the validity of the balance of this agreement. This agreement shall be governed by and construed under the laws and judicial decisions of the State of Illinois. All questions and differences whatsoever which may at any time hereafter arise between the parties hereto touching these presents on the subject matter thereof, or arising out of or in relation thereto, and whether as to construction or otherwise shall be referred to arbitration under the provisions and the supervision of the American Arbitration Association.

17. **Termination.** Publisher shall have the right to terminate this agreement upon thirty (30) days prior written notice.

18. **Assignment.** Publisher shall have the right to assign this agreement or any of its rights hereunder to any party. This agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective succesors, assigns, heirs, executors, administrators and legal and personal representatives.

19. **Definitions.** For purposes of this agreement, the word "person" means and refers to any individual, corporation, partnership, association or any other organized group of persons or legal successors or representatives of the foregoing. Whenever the expressions "the term of this agreement" or "period hereof" or words of similar connotation are included herein, they shall be deemed to mean and refer to the original period of this agreement and the period of all renewals, extensions, substitutions or replacements of this agreement, whether expressly indicated or otherwise.

20. **Attorneys' Fees.** In the event of any action, suit or proceeding by Publisher against Writer under this agreement, in which Publisher shall prevail, Publisher shall be entitled to recover reasonable attorneys' fees and costs of such action, suit

or proceeding.

        IN WITNESS WHEREOF, the parties hereto have executed this
agreement as of the day and year first above written.

By _____
        Publisher

By _Kenneth Wright_ P.KA- ROMANCE
        Writer

# EXHIBIT 3



**The Library has opened access to the reading rooms by appointment only. More. The Jefferson Building has reopened to visitors via timed, ticketed entry. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|-----------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = sru000100565
Search Results: Displaying 1 of 1 entries



Labeled View

*All dis muzic / written & arr. by Kenneth A. Wright (Romance)*

|  |  |
|--|--|
| **Type of Work:** | Music |
| **Registration Number / Date:** | SRu000100565 / 1986-10-14 |
| **Application Title:** | All this music. |
| **Title:** | All dis muzic / written & arr. by Kenneth A. Wright (Romance) |
| **Description:** | 1 sound cassette + lyrics. |
| **Copyright Claimant:** | © Kenneth Anthony Wright (whose pseud. is Romance) |
| **Date of Creation:** | 1986 |
| **Authorship on Application:** | words, music: Kenneth Anthony Wright (whose pseud. is "Romance") |
| **Names:** | Wright, Kenneth Anthony, 1964- |
|  | Romance, pseud. |
|  | Wright, Romance, pseud. |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record   Format for Print/Save |
| Enter your email address: _____   Email |

Help  |  Search  |  History  |  Titles  |  Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page